## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **Great Lakes Packers, Inc., et al.,** | | **Case No.  1:18cv2754 (lead case)** |
| | | **1:18cv2849** |
| | | **1:18cv2906** |
| | **Plaintiffs,** | **1:19cv1673** |
| **-vs-** | | |
| | | **JUDGE PAMELA A. BARKER** |
| **P.K. Produce, Inc., et al.,** | | |
| | **Defendants** | **MEMORANDUM OPINION & ORDER** |

Currently pending is the Motion of Defendants P.K. Produce, Inc., Debra Kasapis, and Sipasak Properties, LLC to Permit Defendant Debra Kasapis to Liquidate and/or Encumber the Assets of Defendant Sipasak Properties, LLC.  (Doc. No. 120.)  Plaintiffs opposed the motion.  (Doc. No. 125.)  For the following reasons, Defendants' Motion is GRANTED as set forth herein.

I.      **Factual Allegations Relevant to Defendants' Motions**

Defendant P.K. Produce, Inc. was originally formed many years ago by the father of Defendant Paul Kasapis (hereinafter "Paul").  (Depo. of Paul Kasapis (Doc. No. 173-1) at Tr. 9; Depo. of Debra Kasapis (Doc. No. 175-1) at Tr. 34.)  Paul's father was a produce broker; i.e., he took produce orders from local stores, purchased produce from the terminal markets in Cleveland or Pittsburgh, loaded the produce into his truck, and delivered it to his customers.  (Doc. No. 173-1 at Tr. 10-11.)  Paul worked for P.K. Produce throughout his childhood and after he graduated from high

school in 1988.  (*Id* at Tr. 9-14.)  He assumed total control of the business in 1990 or 1991.[1]  (*Id.* at Tr. 14.)

In 1997, Paul and Defendant Debra Kasapis (hereinafter "Debra") were married.  (*Id.* at Tr. 15.)  Debra did not acquire an interest in P.K. Produce at that time and had no experience in the produce business.  (*Id.* at Tr. 15, 74-75, 218.)  After Paul and Debra married, Debra devoted her time to raising their three children and "periodically worked in the truck brokerage business" and for the family bowling alley.  (Affidavit of Debra Kasapis (Doc. No. 120-2) at ¶ 11.)  She did not have any involvement in the day-to-day operations of P.K. Produce prior to June 2018.  (*Id*. at ¶ 16.)  *See also* Doc. No. 175-1 at Tr. 36.

In 2003 or 2004, Paul and Debra formed Defendant Sipasak Properties.  (Doc. No. 173-1 at Tr. 28.)  The original business model for Sipasak Properties was to buy houses, fix them up, and sell them for a profit.  (*Id*. at Tr. 28-29.)  *See also* Doc. No. 120-2 at ¶ 3.  However, after the real estate market crashed in 2008, Sipasak Properties instead purchased "cheaper" properties and either leased or rented them.  (Doc. No. 173-1 at Tr. 28-29; Doc. No. 120-2 at ¶ 3.)  Sipasak Properties currently owns approximately 30 properties.[2]  *See* Doc. No. 125-14.  *See also* Doc. No. 175-19 at PageID#s 2693-2697.

In addition, Paul and Debra acquired a bowling alley in 2014, i.e. Defendant Strike Zone Lanes LLC.  (Doc. No. 175-1 at Tr. 26.)  Between 2014 and 2018, Debra owned 49% of Strike Zone

---

[1] Several years later, in 1993, Paul formed Defendant Magnum Express Trucking, Inc. for the purpose of hauling general commodities.  (*Id.* at Tr. 30, 255-256.)  Paul testified that Magnum operated from 1993 until 2005, at which time it became "dormant."  (*Id*. at Tr. 255-256.)  He stated that he subsequently "resurrected" Magnum in 2015 or 2016. (*Id.*)

[2] According to a list prepared by Debra, some of these properties appear to be residential and some appear to be commercial properties.  (Doc. No. 175-19 at PageID#s 2693-2697.)  This document appears to indicate that the listed properties were purchased between 2006 and 2015.  (*Id.*)

Lanes and "ran the bar."  (*Id*. at Tr. 27.)  According to Debra, Paul owned 51% of Strike Zone during this time period and was responsible for all other aspects of its operation.  (*Id*. at Tr. 27-28.)

At some point in 2015, Paul and Debra were "charged with illegal gambling."[3]  (Doc. No. 173-1 at Tr. 19-20; Doc. No. 175-1 at Tr. 161-162.)  As a result, at least one of P.K. Produce's longtime customers left and P.K. Produce "needed new customers."  (Doc. No. 173-1 at Tr. 23.)  Paul testified that, in April 2017, P.K. Produce opened up a location at the Cleveland Produce Terminal and obtained a Perishable Agricultural Commodities Act ("PACA") license.  (*Id.* at Tr. 23, 256.)

In early 2018, Paul pled guilty to federal charges of tax evasion and money laundering.  *See United States v. Paul Kasapis*, Case No. 5:17cr486 (N.D. Ohio).  On May 31, 2018, he was sentenced to fifteen (15) months in prison and ordered to pay $533,434.32 in restitution to the Internal Revenue Service.  *Id.*  Paul reported to federal prison on June 28, 2018.  (Doc. No. 173-1 at Tr. 33.)

Shortly before going to prison, Paul transferred his full interest in P.K. Produce, Sipasak Properties, Magnum Express Trucking, and Strike Zone Lanes to Debra.[4]  *See* Doc. No. 120-2 at ¶ 14; Doc. No. 173-1 at Tr. 68-69; Doc. No. 175-1 at Tr. 23-27.)  Because Debra had no experience in the produce business, Paul arranged to have his longtime friend, Jeffrey Heestand, assist Debra with P.K. Produce's daily operations.  (Doc. No. 173-1 at Tr. 75-76, 143-144; Doc. No. 175-1 at Tr. 20-

---

[3] The publicly available docket reflects that, in December 2017, Paul was charged in this Court with two counts of tax evasion in violation of 26 U.S.C. §§ 7201 and 7202, and two counts of money laundering in violation of 18 U.S.C. § 1957.  *See United States v. Paul Kasapis*, Case No. 5:17cr486 (N.D. Ohio) (Gaughan, J.)  Debra testified that she faced state charges only and was convicted of a felony in December 2017 or January 2018 for "running an illegal gaming house."  (Doc. No. 175-1 at Tr. 161-162.)

[4] Paul and Debra both testified that the transfer of ownership of P.K. Produce occurred because P.K. Produce could no longer maintain any commercial bank accounts as long as Paul remained an owner, while he was serving in prison.  (Doc. No. 173-1 at Tr. 71-72, 217; Doc. No. 175-1 at Tr. 46.)  Paul testified that his intent was to return to operate P.K. Produce once he served his time. (Doc. No. 173-1 at Tr. 68-69, 74-75.)

21; Doc. No. 120-2 at ¶ 16.)  According to Paul, Heestand was supposed to maintain P.K. Produce's books, pay the bills, get the drivers, and "run the trucks."[5]  (Doc. No. 173-1 at Tr. 77.)

Although the parties disagree as to what precisely happened next, all would agree that things did not go well.  During her deposition, Debra testified that Heestand failed to help with daily operations as promised and, further, did not provide direct answers to her questions regarding P.K. Produce's finances.[6]  (Doc. No. 175-1 at Tr. 43, 47, 52-54.)  In addition, both Debra and Heestand testified to considerable frustration with the lack of an accounting system and clear documentation regarding P.K. Produce's finances.  (Doc. No. 175-1 at Tr. 174-177; Doc. No. 174-1 at Tr. 41-46.)

By October 31, 2018, Debra decided to shut down P.K. Produce because "people were not paying" and they "just could not make any headway anywhere."  (Doc. No. 173-1 at Tr. 81, 145; Doc. No. 175-1 at Tr. 43.)  She testified as follows:

> Q:     What do you remember about your conversations with Paul, specifically about closing the company?
>
> A:     That there was just no money coming in, and I couldn't get anywhere with Danny or Brett [Patalita].  Jeff [Heestand] was not there on a daily basis like I was told he was going to be, and I had two other businesses and three kids to take care of, and I couldn't do it.

---

[5] Debra and Paul testified that Dan Patalita and his son, Brett Patalita, were also supposed to assist in the daily operations of P.K. Produce.  Dan Patalita was a salesperson for P.K. Produce.  (Doc. No. 174-1 at Tr. 36.)  Debra testified that Brett Patalita was the "chief financial officer" of P.K. Produce and was responsible for accounts payable and accounts receivable.  (Doc. No. 175-1 at Tr. 30-33.)  Paul testified that Brett Patalita "set up the accounting system" for P.K. Produce and was responsible for billing.  (Doc. No. 173-1 at Tr. 53-54.)  As discussed *infra,* after Paul went to prison, Debra and Heestand became very frustrated with Brett Patalita (hereinafter "Brett").  Heestand testified that there was, in fact, no accounting system for P.K. Produce and no accounting books or financial statements of any kind.  (Doc. No. 174-1 at Tr. 41-46.)  Debra and Heestand both testified that, despite repeated requests, Brett refused to provide information to them regarding P.K. Produce's finances.  (Doc. No. 174-1 at Tr. 43-46; Doc. No. 175-1 at Tr. 42, 174-176.)  Debra "adjusted" Brett's pay scale and threatened to fire him.  (Doc. No. 175-1 at Tr. 42, 174-176.)  Brett terminated his employment with P.K. Produce at some point in or around August or September 2018.  (Doc. No. 175-1 at Tr. 42; Doc. No. 174-1 at Tr. 45, 51.)

[6] Debra also testified that she now suspects Heestand may have stolen money from P.K. Produce and/or Magnum Express.  (Doc. No. 175-1 at Tr. 53-54.)

(Doc. No. 175-1 at Tr. 43.)  Debra instructed Heestand to bring P.K. Produce's equipment and files to the vacant lot next door to her home in Canton.  (*Id*. at Tr. 51.)  Heestand testified that, to his knowledge, no efforts were made to collect on outstanding invoices:

> Q:    So basically, the produce operation was shut down with accounts receivables unknown, and nobody followed up?
>
> A:    To my knowledge, yes.
>
> Q:    And then to make matters even better, there was no place that they could – the customers could send checks to anymore?
>
> A:    Correct.

(Doc. No. 174-1 at Tr. 61.)  Heestand testified that, to the best of his knowledge, P.K. Produce was owed approximately $402,433.33 at the time it closed.[7]  (*Id.* at Tr. 113.)

Debra testified that, from June 2018 forward, no payments were made from P.K. Produce to either Sipasak Properties or Strike Zone.[8]  (Doc. No. 175-1 at Tr. 68-70.)  In an affidavit attached to her Motion to Permit Liquidation of Sipasak Properties, Debra states that "none of the properties owned by Sipasak are PACA Trust Assets, and none are assets derived from or related to the PACA Trust."  (Doc. No. 120-2 at ¶ 5.)  She further avers that "she has been solely managing the properties since approximately June 2018, that no PACA Trust Assets were used to maintain any of the properties, and that many of the properties are in very poor condition and are not rentable."  (*Id.* at ¶

---

[7] Plaintiffs assert that, of this amount, less than $70,000 has been collected to date and deposited for the benefit of the PACA creditors.  (Doc. No. 125 at p. 12.)

[8] Debra testified that Magnum Express ceased operations in November 2018, after it received an unsatisfactory rating in a DOT and PUCO audit.  (Doc. No. 175-1 at Tr. 59.)

6.)  Finally, Debra states that "the income from the properties does not cover the cost of the upkeep of the properties, including remaining current on the real estate property taxes."  (*Id.* at ¶ 7.)

With regard to Strike Zone Lanes, Debra states that Strike Zone Lanes has been the primary source of her income for the past four years and that "Defendant Paul Kasapis has not contributed any funds to the family household since June 2018."[9]  (*Id.* at ¶ 19.)  Paul was released from prison in August 2019.  (Doc. No. 175-1 at Tr. 56.)

## II.    Procedural History

On November 2018, Plaintiffs Great Lakes Packers, Inc. and Keith Connell, Inc. filed a Complaint against Defendants P.K. Produce, Inc., Paul Kasapis, Debra Kasapis, Sipasak Properties, LLC, and The Kasapis Family Irrevocable Intervivos Trust.  (Doc. No. 1.)  Plaintiffs alleged that, between July and October 2018, they sold produce in the total amount of $102, 353.24 to Defendant P.K. Produce, and that P.K. Produce failed to pay.  (Id. at ¶¶ 10-12.)  These Plaintiffs' Complaint alleged breach of contract as well as various claims for violations of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a, *et seq.*  (*Id.*)  These Plaintiffs also filed Motions for Preliminary Injunction and for Temporary Restraining Order.  (Doc. Nos. 5, 10.)

In February 2019, upon motion, the instant action was consolidated with two other cases in this District; i.e., *C.H. Robinson Worldwide, Inc., et al. v. P.K. Produce, Inc., et al.*, Case No. 1:18cv2849 (N.D. Ohio) and *B&D Produce Sales LLC v. P.K. Produce, Inc., et al.*, Case No. 1:18cv2906 (N.D. Ohio).  *See* Doc. No. 19; Non-Document Order dated Feb. 13, 2019.  In these cases, Plaintiffs C.H. Robinson Worldwide, Inc., Original Produce Distributing, Inc., The Players

---

[9] Debra states that, in February 2019, she filed for divorce from Paul in the Stark County Common Pleas Court, Division of Domestic Relations.  (Doc. No.120-2 at ¶ 9.)  She avers that her divorce proceedings have been stayed until the Preliminary Consent Injunction in this case is lifted or the instant case is resolved.  (*Id.*)

Sales, Inc., and B&D Produce Sales LLC alleged that they had each sold produce to P.K. Produce between January 2018 and October 2018, and that P.K. Produce had failed to pay.  These Plaintiffs asserted claims against Defendants P.K. Produce, Paul Kasapis, Debra Kasapis, and Sipasak Properties for breach of contract and PACA violations in the total aggregate amount of $466, 261.87. *See* Case No. 1:18cv2849 (Doc. No. 5 at ¶ 10); Case No.  1:18cv2906 (Doc. No. 1 at ¶ 10).

On February 14, 2019, then-assigned District Judge Solomon Oliver entered a Preliminary Consent Injunction, which provided, in relevant part, as follows:

14. PACA establishes a statutory trust under which Defendants are trustees required to hold all its perishable agricultural commodities ("Produce"), inventories of food or other products derived from Produce, **receivables or proceeds from the sale of Produce and its products, and all inventories or assets purchased or maintained with the funds from a commingled account (collectively, the "PACA Trust Assets")** in trust for the benefit of its Produce suppliers and sellers, such as Plaintiffs. 7 U.S.C. § 499e(c)(2).

### AGREEMENT

15. The attorneys for the Parties in all three cases have conferred and reached the following agreement to:

(a) obtain an injunction to maintain the status quo of the PACA Trust Assets and to prevent any further dissipation of the PACA Trust Assets until the assets of P.K. Produce can be inventoried and sold or otherwise liquidated;

(b) escrow and segregate all sales or liquidation proceeds to be preserved solely for payment of valid PACA trust claims until all potential PACA trust beneficiaries have been able to assert their claims and the Parties can establish a claims procedure to provide a mechanism to identify and validate PACA trust claims; and

(c) provide for priority disbursement of funds to reimburse the valid PACA trust beneficiaries.

***

18.    Defendants consent that creditors with valid PACA trust claims are entitled to a beneficial interest in the single floating pool of Defendants' PACA Trust Assets, and that qualified PACA trust beneficiaries presumptively have first priority interests in and rights to the PACA Trust Assets, including without limitation, furniture, fixtures, equipment, vehicles, leases, real property and leasehold improvements, all of which should be considered or deemed to be included within the definition of PACA Trust Assets.

19.    Defendants reserve all rights to contest the determination of what constitutes PACA Trust Assets and amount, validity and PACA trust status of creditors alleging that they have valid PACA trust claims and that properly join this action, as well as all legal and equitable defenses available with respect to the claims asserted in this case, including the right to seek to be removed from obligations contained in this Order.

(Doc. No. 21) (emphasis added).  Judge Oliver then ordered that "Defendants cannot transfer, sell, or otherwise encumber any of their **real or personal assets derived from or related to the PACA trust** until further order of this Court, unless all proceeds from the transfer or sale are immediately deposited upon sale or transfer to P.K. Produce's operating account ("the Operating Account") held at Chase Bank."  (*Id.* at ¶ 21) (emphasis added).

Over the course of the next several months, a number of additional Plaintiffs joined the instant action.  In April 2019, Farm-Wey Produce, Inc. was granted leave to intervene and filed an Intervenor's Complaint against Defendants P.K. Produce, Paul Kasapis, Debra Kasapis, and Sipasak Properties.  Farm-Wey alleged that it had sold produce to P.K. Produce in the total amount of $122,156 between July 2018 and August 2018, and that P.K. Produce had failed to pay.  (Doc. No. 38.)  Like the other plaintiffs, Farm-Wey asserted claims for breach of contract and various PACA violations.  (*Id.*)

In August 2019, upon motion, this matter was consolidated with *R&R Produce v. P.K. Produce, Inc.,* Case No. 1:19cv1673 (N.D. Ohio).  In its Complaint, R&R Produce alleged various claims against Defendants P.K. Produce, Paul Kasapis, Debra Kasapis, and Does 1 - 10, and also

asserted claims against defense counsel George Argie and the law firm of Argie, D'Amico, and Vitantonio.  *See* Case No. 1:19cv1673 (Doc. No. 1.)  R&R Produce's claims were based on sales of produce in the total amount of $131,983.35 to P.K. Produce between August and October 2018. (*Id*.)

Later that month, Plaintiffs C.H. Robinson Worldwide, Original Produce, and The Players Sales were granted leave to file an amended complaint adding two new party plaintiffs, i.e. The Midwest's Best Produce Company and Victory Farm Sales.  (Doc. No. 62.)  These two new plaintiffs asserted claims against Defendants in the amounts of $26, 411 and $29, 201.50, respectively.  (*Id*.)

This case was re-assigned to the undersigned on July 3, 2019 pursuant to General Order 2019-13.  A status conference was conducted on September 4, 2019, at which time case management deadlines were extended[10] and the matter was referred to Magistrate Judge Baughman for mediation. (Doc. No. 77.)  Magistrate Judge Baughman thereafter scheduled mediation proceedings for January 14, 2020.  (Doc. No. 78.)

On October 4, 2019, Plaintiffs filed a Joint Motion for Entry of Order Determining Validity and Extent of PACA Trust Claims, which Defendants opposed.  (Doc. Nos. 83, 84, 85.)

Upon motion of the parties, the case management deadlines were again extended, with discovery due by April 2, 2020, dispositive motions due by June 1, 2020, and parties to be added and pleadings amended by February 20, 2020.  (Doc. No. 94.)  Magistrate Judge Baughman rescheduled mediation proceedings to April 1, 2020 and, later, postponed them indefinitely.

---

[10] At the Case Management Conference, Judge Oliver set the following deadlines:  (1) parties to be added and pleadings amended by August 24, 2019; (2) discovery due by October 5, 2019, and (3) dispositive motion due by November 15, 2019.  (Doc. No. 51.)  At the September 2019 status conference, the deadline to add parties and amend pleadings was extended to November 22, 2019, the discovery deadline was extended to January 3, 2020, and the dispositive motion deadline was extended to March 1, 2020.  (Doc. No. 77.)

In March 2020, the various groups of Plaintiffs each filed Amended Complaints adding new party defendants 3DLogistics, LLC;[11] Magnum Express Trucking, Inc.; and Strike Zone Lanes, LLC.[12] (Doc. Nos. 97, 104, 105, 106, 108.)  Moreover, in April 2020, Defendants P.K. Produce, Debra Kasapis, and Magnum Express Trucking filed a Third-Party Complaint against Jeffrey Heestand, asserting claims for conversion and civil theft.  (Doc. No. 154.)

Meanwhile, on March 26, 2020, Defendants P.K. Produce, Debra Kasapis, and Sipasak Properties filed a Motion to Permit Debra Kasapis to Liquidate and/or Encumber the Assets of Defendant Sipasak Properties, LLC.  (Doc. No. 120.)  Plaintiffs opposed the Motion, after which Defendants filed a Reply.  (Doc. Nos. 125, 136.)

The Court conducted a status conference with counsel on May 19, 2020.  (Doc. No. 162.)  At that time, the parties requested a re-referral to Magistrate Judge Baughman for mediation.  (*Id*.)  The parties also suggested that a ruling on Defendants' Motion to Permit Debra Kasapis to Liquidate the Assets of Defendant Sipasak Properties would be useful to the mediation process.[13]  (*Id*.)  The Court referred the matter to Judge Baughman for mediation to occur in July 2020.  (*Id*.)  In addition, the Court extended the discovery deadline to September 15, 2020 and the dispositive motion deadline to October 31, 2020.  (*Id*.)

## III.  Analysis

---

[11]  Defendant 3D Logistics is owned by Jeffrey Heestand's wife, Amy Heestand.  3D Logistics failed to file an Answer or otherwise timely appear, and default was entered against it in May and June 2020.  (Doc. Nos. 149, 166, 168, 171.)

[12]  In addition, those Plaintiffs who had not originally named the Kasapis Family Trust as a defendant did so in their Amended Complaints.

[13]  The Court was specifically asked not to rule upon Plaintiffs' Joint Motion for Entry of An Order determining the Validity and Extent of PACA Trust Claims filed on October 4, 2019 (Doc. No. 83), because ruling on the motion would have a "tremendous impact" on the parties' ability to resolve the matter at mediation. (Doc. No. 162.)

In Defendants' Motion, Debra Kasapis moves the Court for an Order permitting her to liquidate and/or encumber the assets of Defendant Sipasak Properties. (Doc. No. 120 at p. 2.) She maintains that "none of the properties owned by Sipasak are PACA Trust Assets, and none are assets derived from or related to the PACA Trust." (*Id*.) Debra argues that she is currently "unable to financially maintain the costs of her household, her defense in the within litigation, and the divorce action." (*Id*. at p. 4.) She asserts as follows:

> The [ten] Plaintiffs in the within case are seeking in excess of $1 million for produce debt, interest, and attorney fees from her personally. These claims cover an approximately 4-½ month period of time, from June 2018 through October 31, 2018, when P.K. Produce closed its doors. These debts were incurred during the time that she was placed in a position of ownership for the sole purpose of opening a bank account to allow P.K. Produce to operate, when she had little or no involvement in the business and the business was being run on a daily basis by others. Debra has a considerable account balance with her legal counsel in both the within litigation and in the divorce case (both of whom have been very patient and understanding), and she is getting to a point where she can no longer continue to pay her bills. Being able to sell or encumber the Sipasak properties will enable her to at least have a chance to survive and defend herself against these very substantial claims. Although Debra Kasapis denies any liability and plans to vigorously defend the claims, if the Plaintiffs are successful in holding her personally liable for the claims being made, then all of the Sipasak properties, and any other assets accumulated during her lifetime, could be subject to seizure.

(*Id.* at pp. 4-5.)

Plaintiffs argue that Defendants' Motion should be denied for a number of reasons. First, Plaintiffs argue that Debra should not be permitted to liquidate and/or encumber Sipasak Properties' assets because "Sipasak's assets are PACA Trust Assets."[14] (Doc. No. 125 at p. 2.) Plaintiffs maintain that, through discovery, they "have obtained evidence directly contradicting Defendants'

---

[14] Plaintiffs argue that "the real properties owned by Sipasak appear to be the main assets that Defendants have to satisfy a PACA judgment." (Doc. No. 125 at p. 2.) They argue that "without a written global resolution in settlement terms, there can be no sale of any of the properties owned by Sipasak." (*Id*.)

11

contention that no PACA monies were used for the benefit of Sipasak, because P.K. Produce money was in fact used to pay some of Sipasak's expenses." (*Id*.)  Plaintiffs further assert that Defendants' Motion should be denied because Debra is personally liable in light of "ample deposition testimony showing that during relevant times, Debra was involved in decisions regarding the operation of the day to day business, as well as the closure of the business, and that Debra used P.K. Produce money to pay or reimburse herself or her husband, pay the expenses of other businesses and personal items, as well as appropriated P.K. Produce assets for her own benefit." (*Id*.)  In this regard, Plaintiffs argue that they "have a right to get a prejudgment writ of attachment against both individual defendants in this case as the responsibly connected parties." (*Id*. at p. 13.)

Plaintiffs also argue that Defendants should not be permitted to use Sipasak Properties sales proceeds to pay attorneys' fees in this action or the fees of their domestic relations counsel and, further, that "any attorneys' fees taken so far by defense counsel are subject to disgorgement." (*Id*. at pp. 2, 14.)  Lastly, Plaintiffs argue that Defendants' Motion is overly vague because it fails to specify whether Defendants seek a sale or an encumbrance or how many and which properties they would like to sell. (*Id*. at p. 14.)  Plaintiffs also complain that Defendants have not detailed "the exact use of the proceeds." (*Id*.)

In response, the moving Defendants argue that Plaintiffs have failed to prove that any PACA trust funds were used in connection with Sipasak Properties or to pay defense counsel. (Doc. No. 136 at p. 5.)  Defendants assert that Plaintiffs' argument regarding Debra's alleged personal liability "puts the cart before the horse" and constitutes an improper attempt to obtain a prejudgment attachment of Debra's personal assets. (*Id*. at p. 7.)  Defendants argue that "Plaintiffs cite no law in

support of their perceived ability to obtain such a draconian measure as prejudgment attachment."
(*Id.*)

As the Sixth Circuit has explained, "PACA provides a comprehensive regulatory scheme for the sale of produce in interstate commerce." *Six L's Packing Co., Inc. v. Beale*, 524 Fed. Appx. 148, 152 (6th Cir. April 8, 2013).  "'Under the Act, when a seller, dealer, or supplier ships produce to a buyer, a statutory trust is created upon acceptance of the commodities.'" *Id.* (quoting *Golman–Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000)).  *See also* 7 U.S.C. §§ 499a–499t.  Specifically, the statute provides for the formation of a trust as follows:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2).

The trust created by the above statute protects sellers of perishable agricultural commodities against financing arrangements made by merchants who encumber commodities or the proceeds thereof, thus giving sellers precedence over the claims of secured creditors.  *See e.g., Overton Distrib. v. Heritage Bank*, 340 F.3d 361, 365 (6th Cir. 2003); *J.A. Besteman Co. v. Carter's Inc.*, 439 F.Supp.2d 774, 777 (W.D. Mich. 2006).  The legislative history to the 1984 amendments to this statute explains the need to protect produce suppliers, as follows:

> Sellers of agricultural commodities are often located thousands of miles from their customers. Sales transactions must be made quickly or they are not made at all.... Under such conditions, it is often difficult to make credit checks, conditional sales agreements, and take other traditional safeguards.
> ....

> Many [buyers], in the ordinary course of their business transactions, operate on bank loans secured by [their] inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer failed to make payment as required by the contract.

H. R. Rep. No. 98–543, 98th Cong., 1st Sess. 3 (1983).  *See also Sanzone-Palmisano Co. v. M. Seaman Enterprises, Inc*., 986 F.2d 1010, 1012 (6th Cir. 1993).

Thus, PACA sought to protect produce sellers by creating "'a trust obligation ..., prior to and superior to any lien or security interest in inventory held by the [buyer's] secured lender.'" *Sanzone-Palmisano Co.*, 986 F.2d at 1012 (quoting *In re Prange Foods, Corp*., 63 B.R. 211, 214 (Bankr.W.D.Mich.1986)).  Moreover, the Sixth Circuit has explained that the PACA trust created by § 499e(c)(2) is a "floating" trust, in that it applies to all of the buyer's produce and inventory and all proceeds from the sale of produce.  *Sanzone-Palmisano*, 986 F.2d at 1012.  The trust beneficiary is therefore not obligated to trace assets.  *Id.* (stating that "the trust beneficiary is not obligated to distinguish the assets to which its trust applies from other produce-related assets.") *See also J.A. Besteman Co*., 439 F.Supp.2d at 777; *Shippers Service Co., Inc. v. Fresh Louie's Produce Co., LLC*, 2010 WL 726242 at * 2 (E.D. Mich. Feb. 24, 2010).  Rather, when trust and non-trust assets are commingled, it is the PACA debtor that "has the burden of showing that the disputed assets were not acquired with proceeds from the sale of produce or produce-related assets." *Id*. at 1014.

In order for the PACA trust obligation to arise, however, the disputed asset must constitute a PACA Trust Asset.  Here, the parties disagree, strenuously, as to whether the assets of Defendant Sipasak Properties constitute PACA Trust Assets.  As noted above, Debra Kasapis submitted an Affidavit in which she swears that (1) none of the properties owned by Sipasak Properties are PACA Trust Assets; (2) none of said properties are assets derived from or related to the PACA Trust; and

14

(3) no PACA Trust Assets were used to maintain any of the properties.  (Doc. No. 120-2 at ¶¶ 5, 6.) Citing various deposition testimony, Plaintiffs insist that the properties and other assets owned by Sipasak Properties are subject to the Trust because they were "maintained with PACA Trust Assets." (Doc. No. 125 at p. 10.)  Plaintiffs point to the following evidence in support of this assertion, none of which the Court finds persuasive.

First, Plaintiffs argue that "Paul testified that a P.K. Produce check was used to pay Dutch Craft for replacing a roof."  (Doc. No. 125 at p. 10.)  The record reflects that Paul Kasapis testified about this check as follows:

> Q:  So, looking at the next page, at 691.  There's a [P.K. Produce] check, for example, on the bottom to Dutch Craft for $1,716.  Who is Dutch Craft?
>
> A:  They are truss builder.
>
> ***
>
> Q:  What is a truss?
>
> A:  Gable for a roof.
>
> Q:  So this would have been to replace a roof on a property?
>
> A:  Yes. **No, not on a property.**  I don't know what this one is for, but this is back in 2016.
>
> Q:  Correct.
>
> A:  **Not sure what it was for**.

(Doc. No. 173-1 at Tr. 162-163) (emphasis added).  The Court agrees with Defendants that the above testimony does not establish that PACA Trust assets were used to pay for a roof on a property owned by Defendant Sipasak Properties.  Plaintiffs' counsel does not connect the $1,716 check for a roof to any of the properties owned by Defendant Sipasak Properties.  In fact, Paul testified that he was not

15

sure what the check was for and did not think that the check was to replace a roof on a property.  (*Id.*) This testimony is simply not sufficient to demonstrate that P.K. Produce funds were used to maintain properties owned by Defendant Sipasak Properties or otherwise commingled with Defendant Sipasak Properties assets.

Plaintiffs next argue as follows: "Paul further testified that Sipasak Properties owned a vehicle which is the only vehicle that Debra used for her personal transport.  Jeffrey [Heestand] testified that P.K. Produce paid for the insurance for the vehicle that Debra used."  (Doc. No. 125 at p. 10.)  The Court does not agree with Plaintiffs' characterization of this testimony.  The record reflects that Paul testified as follows:

> Q:      What about Debra?  What vehicle did she have?
>
> A:      In 2017 personally?
>
> Q:      Yes.
>
> A:      None.
>
> Q:      None. How did she get around?
>
> A:      Company vehicle.
>
> Q:      What was the company vehicle that she used?
>
> A:      Sipasak Properties.
>
> Q:      What vehicle was that, that was owned by Sipasak?
>
> A:      2011 GMC.  No. I'm not sure.  Chevy or it's an Acadia.

(Doc. No. 173-1 at Tr. 50-51.)  Heestand testified as follows:

> Q:      Okay.  Going to the next page, page 569, there was a check issued [by P.K. Produce] to Progressive Preferred Insurance premium for $10,000.  Do you see that?

16

A:      Yes.

Q:      And do you know what policy Progressive Preferred issued – what policy was for, that – this 10,000-dollar payment?  What company was it with?

A:      I don't remember which one that was for.  But Progressive had Debbie's car insurance and they had the Magnum Trucks as well.

Q:      Okay.  Debbie's car insurance, Magnum trucks.  And was it P.K. Produce as well?

A:      No.

(Doc. No. 174-1 at Tr. 103-104.)  Later, Heestand was asked about another check to Progressive, as

follows:

Q:      Okay.  And then there's a Progressive Preferred Insurance premium for $10,000.  Again, that was for Magnum and Debbie's personal policy?

A:      They were two separate.  I'm not sure.  Like I said, I know they were both Progressive, but I don't know which one that was paid out of or which one that was paid for, I should say.

Q:      Okay.  All right.  And there was another Progressive Preferred Insurance premium of 2, 254, so that was on a – no.  It looks like it was the same policy?

A:      Yes.

Q:      Okay.  So were Debbie's cars and Magnum's cars insured under the same policy?

A:      No.

Q:      They were different policies?

A:      They were different policies.

(*Id*. at Tr. 106-107.)  This testimony indicates that (1) in 2017, Debra drove a vehicle that was owned

by Sipasak Properties; (2) the vehicle driven by Debra was insured by Progressive Preferred

Insurance; and (3) on several occasions, P.K. Produce funds were used to pay Progressive Preferred

Insurance premiums. However, as set forth above, Heestand testified that Magnum Express trucks were also insured by Progressive Preferred. While Heestand confirmed during deposition that a P.K. Produce check was used to pay certain Progressive Preferred Insurance premiums, he expressly testified that Debra's and Magnum's cars were insured under different policies and he did not know whether the P.K. Produce checks at issue were used to pay for the policy covering Debra's car or whether they were used to pay for the policy covering Magnum's cars. In light of this uncertainty, the Court finds that the testimony cited by Plaintiffs is not sufficient to demonstrate that P.K. Produce funds were used to pay for Defendant Sipasak Properties expenses or otherwise commingled with Sipasak Properties funds.

Lastly, Plaintiffs argue as follows: "[T]hrough discovery, Plaintiffs have obtained copies of P.K. Produce checks signed by either Debra or Paul, as well as electronic transfer records, which show that P. K. Produce's funds were used for numerous items unrelated to the business of P.K. Produce, including the payment of personal draws or expenses, and the payment of business expenses of other companies. Moreover, many of these uses of the P.K. Produce funds have not yet been specifically identified by the Defendants, so these funds very well may have been used to pay other expenses of Sipasak for the maintenance or repair of its properties, payment of property taxes, or other items." (Doc. No. 125 at pp. 10-11.) Plaintiffs then cite generally to over 100 pages of exhibits consisting of copies of various checks and electronic cash withdrawals. (*Id*. at p. 11, fn 18.) Notably, Plaintiffs do not direct this Court's attention to any particular check or withdrawal nor do they argue that any specific transactions demonstrate the use of P.K. Produce funds to pay for expenses or debts of Sipasak Properties.

The Court finds Plaintiffs' argument to be without merit.  Plaintiffs' assertion that P.K. Produce funds "very well may have been used" to pay for Sipasak Properties' expenses is entirely speculative and insufficient to demonstrate that the properties owned by Sipasak Properties constitute PACA Trust Assets.  That is particularly so given that, by Plaintiffs' own admission, the parties have engaged in "significant discovery" since this action was filed over a year and a half ago, in November 2018.  (Doc. No. 125 at p. 5.)  The discovery deadlines in this matter have been extended numerous times, giving Plaintiffs ample opportunity to uncover evidence that P.K. Produce funds were used to pay for the Sipasak Properties' expenses and/or otherwise commingled with Sipasak Properties funds. Despite this, the Court finds that Plaintiffs have failed to direct this Court's attention to any evidence that contradicts Debra's sworn statements that (1) none of the properties owned by Sipasak Properties are PACA Trust Assets; (2) none of said properties are assets derived from or related to the PACA Trust; and (3) no PACA Trust Assets were used to maintain any of the properties.  (Doc. No. 120-2 at ¶¶ 5, 6.)

The Court also rejects Plaintiffs' argument that Defendants' Motion should be denied because Debra is personally liable.[15]  (Doc. No. 125 at p. 11-13.)  The Court finds that it is not appropriate to address, at this time or in this context, the legal question of whether Debra is personally liable under

---

[15] The Sixth Circuit has held that, under certain circumstances, a corporate officer may be held personally liable under PACA.  *See Six L's Packing Co., Inc. v. Beale*, 524 Fed. Appx. 148, 156 (6th Cir. 2013); *Arava USA, Inc. v. Karni Family Farm, LLC*, 474 Fed. Appx.  452 (6th Cir. 2012).  Specifically, in *Arava,* the Sixth Circuit held that "individual shareholders, officers, or directors of a corporation who are in a position to control statutory trust assets, and who fail to preserve those assets, may be held personally liable under the Act."  *Arava,* 474 Fed. Appx. at 156.  In *Six L's*, the court took a somewhat narrow view of the issue, noting that "[n]othing in *Arava* or previous circuit decisions suggests that we should extend PACA-liability to individuals who are not shareholders, officers, or directors of a corporation."  *Six L's,* 524 Fed. Appx. at 156.

PACA.  That is a question that is best left for another day, after discovery is complete[16] and the matter has been fully briefed and presented to the Court in dispositive motions.  Rather, the only question here is whether the assets and property owned by Defendant Sipasak Properties are PACA Trust Assets and, therefore, subject to the statutory PACA trust and this Court's Preliminary Consent Injunction.  Based on the record presently before it, and for all the reasons set forth above, the Court finds that there is insufficient evidence to demonstrate that the assets and property owned by Defendant Sipasak Properties constitute PACA Trust Assets.

Moreover, the Court rejects Plaintiffs' perfunctory argument that "Plaintiffs have a right to get a prejudgment writ of attachment against both individual defendants in this case as the responsibly connected parties."  (Doc. No. 125 at p. 13.)  Plaintiffs raise this argument in a single sentence, with no citation to legal authority, no discussion of the legal standard for prejudgment attachment in this context, and no application of that legal standard to the facts of the instant case.  It is not the Court's function to develop legal arguments on a party's behalf.  Therefore, the Court will not consider the issue of prejudgment attachment as to either Paul or Debra Kasapis under the present circumstances. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *ECIMOS, LLC v. Nortek Global HVAC, LCC*, 736 Fed. Appx. 577, 583 (6th Cir. 2018) (same).

---

[16] The parties have represented to the Court that they need to complete the depositions of Debra, Heestand, and (possibly) Paul.  (Doc. Nos. 153, 155, 156.)

Finally, the Court rejects Plaintiffs' argument that Debra should not be permitted to use funds arising from the liquidation and/or encumbrance of Sipasak Properties' assets to pay for personal expenses, including attorney fees.  Under the Preliminary Consent Injunction, "Defendants cannot transfer, sell, or otherwise encumber any of their real or personal assets **derived from or related to the PACA trust** until further order of this Court."  (Doc. No. 21 at ¶ 21) (emphasis added).  Because the Court has found that the assets of Sipasak Properties are not "derived from or related to the PACA trust," the Court further finds that Sipasak Properties (and/or Debra as sole owner of Sipasak Properties) are not prevented from using the funds for personal expenses, including legal expenses.[17]

Accordingly, Defendants' Motion to Permit Debra Kasapis to Liquidate and/or Encumber the Assets of Defendant Sipasak Properties is granted as follows.  Defendant Sipasak Properties is hereby relieved from the requirements of the Preliminary Consent Injunction entered in this case on February 14, 2019.

## IV.	Conclusion

For all the reasons set forth above, Defendants' Motion to Permit Debra Kasapis to Liquidate and/or Encumber the Assets of Defendant Sipasak Properties (Doc. No. 120) is granted as follows.

---

[17] For this same reason, the Court rejects Plaintiffs' argument that Defendants' Motion should be denied because it fails to specify which properties are to be liquidated and "the exact [intended] use of the proceeds."  (Doc. No. 125 at p. 14.)  As the assets and properties owned by Defendant Sipasak Properties are not PACA Trust Assets, the Court finds that Defendants need not articulate exactly what they intend to do with these assets.  Indeed, Plaintiffs cite no legal authority to the contrary.

Defendant Sipasak Properties is hereby relieved from the requirements of the Preliminary Consent Injunction entered in this case on February 14, 2019.

**IT IS SO ORDERED.**


_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  June 12, 2020                    U. S. DISTRICT JUDGE