# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **Great Lakes Packers, Inc.,** | | **Case No.  1:18cv2754 (lead case)** |
| **et al.,** | | **1:18cv2849** |
| | | **1:18cv2906** |
| | **Plaintiffs,** | **1:19cv1673** |
| **-vs-** | | |
| | | **JUDGE PAMELA A. BARKER** |
| **P.K. Produce, Inc., et al.,** | | |
| | **Defendants** | **MEMORANDUM OPINION & ORDER** |

Currently pending are (1) Plaintiffs' Joint Motion for Partial Summary Judgment (Doc. No. 184); and (2) Defendant Debra Kasapis' Cross Motion for Summary Judgment (Doc. No. 189.)  Briefs in Opposition were filed on January 4, 2021 and February 9, 2021 (Doc. Nos. 188, 190, 192.)  For the following reasons, Plaintiffs' Joint Motion for Partial Summary Judgment (Doc. No. 184) is GRANTED IN PART and DENIED IN PART, and Defendant Debra Kasapis' Cross Motion for Summary Judgment (Doc. No. 189) is DENIED, as set forth herein.

## I.    Facts

Defendant P.K. Produce, Inc. was originally formed many years ago by the father of Defendant Paul Kasapis (hereinafter "Paul").  (Depo. of Paul Kasapis (Doc. No. 173-1) at Tr. 9; Depo. of Debra Kasapis (Doc. No. 175-1) at Tr. 34.)  Paul's father was a produce broker, i.e., he took produce orders from local stores, purchased produce from the terminal markets in Cleveland or Pittsburgh, loaded the produce into his truck, and delivered it to his customers.  (Doc. No. 173-1 at Tr. 10-11.)  Paul worked for P.K. Produce throughout his childhood and after he graduated from high

school in 1988.  (*Id* at Tr. 9-14.)  He testified that he assumed total control of the business in 1990 or 1991.[1]  (*Id.* at Tr. 14.)

In 1997, Paul and Defendant Debra Kasapis (hereinafter "Debra") were married.  (*Id.* at Tr. 15.)  Debra did not acquire an interest in P.K. Produce at that time and had no experience in the produce business.  (*Id.* at Tr. 15, 74-75, 218.)  After Paul and Debra married, Debra devoted her time to raising their three children and "periodically worked in the truck brokerage business" and for the family bowling alley.  (Affidavit of Debra Kasapis (Doc. No. 120-2) at ¶ 11.)  She testified that she did not have any involvement in the day-to-day operations of P.K. Produce prior to June 2018.  (*Id.* at ¶ 16.)  *See also* Doc. No. 175-1 at Tr. 36.  However, Debra explained that she may have occasionally signed checks to pay P.K. Produce drivers "if Paul wasn't around."[2]  (Deposition of Debra Kasapis (Doc. No. 175-1) at Tr. 65-66.)  In addition, she occasionally purchased parts for the P.K. Produce trucks prior to June 2018 and was reimbursed for those parts from the P.K. Produce bank accounts.  (*Id.* at Tr. 66-67.)

In 2003 or 2004, Paul and Debra formed Defendant Sipasak Properties.  (Doc. No. 173-1 at Tr. 28.)  The original business model for Sipasak Properties was to buy houses, fix them up, and sell them for a profit.  (*Id*. at Tr. 28-29.)  *See also* Doc. No. 120-2 at ¶ 3.  However, after the real estate market crashed in 2008, Sipasak Properties instead purchased "cheaper" properties and either leased or rented them.  (Doc. No. 173-1 at Tr. 28-29; Doc. No. 120-2 at ¶ 3.)  Sipasak Properties currently

---

[1] Several years later, in 1993, Paul formed Defendant Magnum Express Trucking, Inc. for the purpose of hauling general commodities.  (*Id.* at Tr. 30, 255-256.)  Paul testified that Magnum operated from 1993 until 2005, at which time it became "dormant."  (*Id*. at Tr. 255-256.)  He stated that he subsequently "resurrected" Magnum in 2015 or 2016. (*Id.*)

[2] Debra was listed as signatory on a P.K. Produce bank account in November 2014, which authorized her to sign checks from that account.  (Doc. No. 184-8 at PageID# 3433.)

owns approximately 30 properties.  (Doc. No. 125-14.)  *See also* Doc. No. 175-19 at PageID#s 2693-2697.

In addition, Paul and Debra acquired a bowling alley in 2014, i.e. Defendant Strike Zone Lanes LLC.  (Doc. No. 175-1 at Tr. 26.)  Between 2014 and 2018, Debra owned 49% of Strike Zone Lanes and "ran the bar."  (*Id*. at Tr. 27-28.)  According to Debra, Paul owned 51% of Strike Zone during this time period and was responsible for all other aspects of its operation.  (*Id*. at Tr. 27-28.)

At some point in 2015, Paul and Debra were "charged with illegal gambling."[3]  (Doc. No. 173-1 at Tr. 19-20; Doc. No. 175-1 at Tr. 161-162.)  As a result, at least one of P.K. Produce's longtime customers left and P.K. Produce "needed new customers."  (Doc. No. 173-1 at Tr. 22-23.)  Paul testified that, in April 2017, P.K. Produce opened up a location at the Cleveland Produce Terminal and obtained a Perishable Agricultural Commodities Act ("PACA") license.  (*Id*. at Tr. 23, 256.)

In early 2018, Paul pled guilty to federal charges of tax evasion and money laundering.  *See United States v. Paul Kasapis*, Case No. 5:17cr486 (N.D. Ohio).  On May 31, 2018, he was sentenced to fifteen (15) months in prison and ordered to pay $533,434.32 in restitution to the Internal Revenue Service.  *Id.*  Paul reported to federal prison on June 28, 2018.  (Doc. No. 173-1 at Tr. 33.)

On June 19, 2018, shortly before going to prison, Paul transferred his full interest in P.K. Produce, Sipasak Properties, Magnum Express Trucking, and Strike Zone Lanes to Debra for a total

---

[3] The publicly available docket reflects that, in December 2017, Paul was charged in this Court with two counts of tax evasion in violation of 26 U.S.C. §§ 7201 and 7202, and two counts of money laundering in violation of 18 U.S.C. § 1957.  *See United States v. Paul Kasapis*, Case No. 5:17cr486 (N.D. Ohio) (Gaughan, J.)  Debra testified that she faced state charges only and was convicted of a felony in December 2017 or January 2018 for "running an illegal gaming house."  (Doc. No. 175-1 at Tr. 161-162.)

consideration of $1.00.  *See* Doc. No. 120-2 at ¶ 14; Doc. No. 173-1 at Tr. 68-69; Doc. No. 175-1 at Tr. 23-27; Doc. No. 184-6 at PageID# 3429.   Paul and Debra both testified that the transfer of ownership of P.K. Produce occurred because P.K. Produce could no longer maintain any commercial bank accounts as long as Paul remained an owner, while he was serving time in prison.  (Doc. No. 173-1 at Tr. 71-72, 217; Doc. No. 175-1 at Tr. 46.)  Paul testified that his intent was to return to operate P.K. Produce once he served his time. (Doc. No. 173-1 at Tr. 75.)

Because Debra had no experience in the produce business, Paul arranged to have his longtime friend, Jeffrey Heestand, assist Debra with P.K. Produce's daily operations.  (Doc. No. 173-1 at Tr. 75-79, 143-144; Doc. No. 175-1 at Tr. 20-21; Doc. No. 120-2 at ¶ 16.)  According to Paul and Debra, Heestand was supposed to maintain P.K. Produce's books, pay the bills, get the drivers, and "run the trucks."  (Doc. No. 173-1 at Tr. 77.)  *See also* Dec. 30, 2020 Affidavit of Debra Kasapis (Doc. No. 188-2) at ¶ 9.  Once the transfer of P.K. Produce to Debra was complete, Debra opened a commercial bank account (hereinafter referred to as "Account 0278") to operate the company while Paul was in prison.  (Doc. No. 188-2 at ¶ 8.)  Both Debra and Heestand were signatories on Account 0278.  (*Id.* at ¶ 10.)

Debra and Paul also testified that Dan Patalita and his son, Brett Patalita, were supposed to assist in the daily operations of P.K. Produce.  Dan Patalita was a salesperson for P.K. Produce.  (Doc. No. 174-1 at Tr. 36.)  Debra testified that Brett Patalita was the "chief financial officer" of P.K. Produce and was responsible for accounts payable and accounts receivable.  (Doc. No. 175-1 at Tr. 30-33.)  Paul testified that Brett Patalita "set up the accounting system" for P.K. Produce and was responsible for billing.  (Doc. No. 173-1 at Tr. 53-54.)  After Paul went to prison, Debra and Heestand became very frustrated with Brett Patalita (hereinafter "Brett").  Heestand testified that there was, in

4

fact, no accounting system for P.K. Produce and no accounting books or financial statements of any kind.  (Doc. No. 174-1 at Tr. 41-46.)  Debra and Heestand both testified that, despite repeated requests, Brett refused to provide information to them regarding P.K. Produce's finances.  (Doc. No. 174-1 at Tr. 43-46; Doc. No. 175-1 at Tr. 174-176.)  Debra "adjusted" Brett's pay scale and threatened to fire him.  (Doc. No. 175-1 at Tr. 42, 174-176.)  Brett terminated his employment with P.K. Produce at some point in or around August or September 2018.  (Doc. No. 175-1 at Tr. 42; Doc. No. 174-1 at Tr. 45, 51.)  Debra testified that it was her understanding that Heestand took over accounts receivables and payables after Brett left.  (Doc. No. 175-1 at Tr. 52.)

In addition, Debra testified that Paul assisted with the operations of P.K. Produce while he was in prison.  (*Id*. at Tr. 42 - 45, 178.)  Specifically, Debra testified that, while he was incarcerated, she spoke on the phone with Paul and received text messages from him regarding P.K. Produce business matters.  (*Id*.)  Paul, however, denied having any involvement in the operations of P.K. Produce after June 2018, asserting that "[d]uring the 13 months that I was incarcerated, I did not have the ability to conduct business, including phone calls, emails, online banking, transfers of money or phone banking."  (Affidavit of Paul Kasapis (Doc. No. 190-1) at ¶ 6.)

Although the parties disagree as to what precisely happened after Paul transferred his interest in P.K. Produce to Debra, all would agree that things did not go well.  During her deposition, Debra testified that Heestand failed to help with daily operations as promised and, further, did not provide direct answers to her questions regarding P.K. Produce's finances.[4]  (Doc. No. 175-1 at Tr. 43, 47, 52-54.)  In addition, both Debra and Heestand testified to considerable frustration with the lack of an

---

[4] Debra also testified that she now suspects Heestand may have stolen money from P.K. Produce and/or Magnum Express. (Doc. No. 175-1 at Tr. 53-54.)

accounting system and clear documentation regarding P.K. Produce's finances.  (Doc. No. 175-1 at Tr. 174-177; Doc. No. 174-1 at Tr. 41-46.)

By October 31, 2018, Debra decided to shut down P.K. Produce because "people were not paying" and they "just could not make any headway anywhere."  (Doc. No. 175-1 at Tr. 43.)  *See also* Doc. No. 173-1 at Tr. 81, 145.  She testified as follows:

> Q:  What do you remember about your conversations with Paul, specifically about closing the company?
>
> A:  That there was just no money coming in, and I couldn't get anywhere with Danny or Brett [Patalita].  Jeff [Heestand] was not there on a daily basis like I was told he was going to be, and I had two other businesses and three kids to take care of, and I couldn't do it.

(Doc. No. 175-1 at Tr. 43.)  Debra instructed Heestand to bring P.K. Produce's equipment and files to the vacant lot next door to her home in Canton.  (*Id*. at Tr. 51.)  Heestand testified that, to his knowledge, no efforts were made to collect on outstanding invoices:

> Q:  So basically, the produce operation was shut down with accounts receivables unknown, and nobody followed up?
>
> A:  To my knowledge, yes.
>
> Q:  And then to make matters even better, there was no place that they could – the customers could send checks to anymore?
>
> A:  Correct.

(Doc. No. 174-1 at Tr. 61.)  Heestand testified that, to the best of his knowledge, P.K. Produce was owed approximately $402,433.33 at the time it closed.[5]  (*Id*. at Tr. 113.)  Paul was subsequently released from prison in August 2019.  (Doc. No. 175-1 at Tr. 56.)

---

[5] Plaintiffs assert that, of this amount, less than $70,000 has been collected to date and deposited for the benefit of the PACA creditors.  (Doc. No. 125 at p. 12.)

## II.     Procedural History

On November 29, 2018, Plaintiffs Great Lakes Packers, Inc. and Keith Connell, Inc. filed a Complaint against P.K. Produce, Paul, Debra, Sipasak Properties, LLC, and The Kasapis Family Irrevocable Intervivos Trust.  (Doc. No. 1.)  Plaintiffs alleged that, between July and October 2018, they sold produce in the total amount of $102, 353.25 to P.K. Produce, and that P.K. Produce failed to pay.  (*Id*. at ¶¶ 10-12.)  These Plaintiffs' Complaint alleged breach of contract as well as various claims for violations of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a, *et seq*.  (*Id.*)

In February 2019, upon motion, the instant action was consolidated with two other cases in this District; i.e., *C.H. Robinson Worldwide, Inc., et al. v. P.K. Produce, Inc., et al*., Case No. 1:18cv2849 (N.D. Ohio) and *B&D Produce Sales LLC v. P.K. Produce, Inc., et al*., Case No. 1:18cv2906 (N.D. Ohio).  In these cases, Plaintiffs C.H. Robinson Worldwide, Inc., Original Produce Distributing, Inc., The Players Sales, Inc., and B&D Produce Sales LLC alleged that they had sold produce to P.K. Produce between January 2018 and October 2018, and that P.K. Produce had failed to pay.  These Plaintiffs asserted claims against P.K. Produce, Paul, Debra, and Sipasak Properties for breach of contract and PACA violations in the total aggregate amount of $466, 261.87.

Over the course of the next several months, a number of additional Plaintiffs joined the instant action.  In April 2019, Farm-Way Produce, Inc. was granted leave to intervene and filed an Intervenor's Complaint, in which it alleged that it had sold produce to P.K. Produce in the total amount of $122,156 between July 2018 and August 2018, and that P.K. Produce had failed to pay. (Doc. No. 38.)  Like the other plaintiffs, Farm-Way asserted claims for breach of contract and various PACA violations.  (*Id*.)  Several months later, in August 2019, this matter was consolidated with *R&R*

*Produce v. P.K. Produce, Inc.,* Case No. 1:19cv1673 (N.D. Ohio).  In its Complaint, R&R Produce alleged various claims against P.K. Produce, Paul, and Debra, and also asserted claims against attorney George Argie[6] and the law firm of Argie, D'Amico, and Vitantonio.  *See* Case No. 1:19cv1673 (Doc. No. 1.)  R&R Produce's claims were based on sales of produce in the total amount of $131,983.35 to P.K. Produce between August and October 2018.  (*Id.*)  Later that month, Plaintiffs C.H. Robinson Worldwide, Original Produce, and The Players Sales were granted leave to file an amended complaint adding two new party plaintiffs, i.e. The Midwest's Best Produce Company and Victory Farm Sales.  (Doc. No. 62.)  These two new plaintiffs asserted claims against Defendants in the amounts of $26, 411 and $29, 201.50, respectively.  (*Id.*)

In March 2020, the various groups of Plaintiffs each filed Amended Complaints adding new party defendants 3DLogistics, LLC;[7] Magnum Express Trucking, Inc.; and Strike Zone Lanes, LLC.[8] (Doc. Nos. 97, 104, 105, 106, 108.)  Moreover, in May 2020, Defendants P.K. Produce, Debra Kasapis, and Magnum Express Trucking filed a Third-Party Complaint against Jeffrey Heestand, asserting claims for conversion and civil theft.  (Doc. No. 154.)

Meanwhile, Plaintiffs filed a Joint Motion for Entry of Order Determining Validity and Extent of PACA Trust Claims, which Defendants opposed.  (Doc. Nos. 83, 84, 85.)  In October 2020, the

---

[6] The docket reflects that Mr. Argie is currently counsel for Defendants P.K. Produce, Debra Kasapis, Sipasak Properties, Magnum Express Trucking, and Strike Zone Lanes in this action. He is also representing himself and his law firm, Argie, D'Amico, and Vitantonio, in this action.

[7] Defendant 3D Logistics is owned by Jeffrey Heestand's wife, Amy Heestand.  As discussed *infra,* 3D Logistics failed to file an Answer or otherwise timely appear, and default was entered against it in May and June 2020.  (Doc. Nos. 149, 166, 168, 171.)

[8] In addition, those Plaintiffs who had not originally named the Kasapis Family Trust as a defendant did so in their Amended Complaints.

8

Court issued a Memorandum Opinion & Order in which it granted the Plaintiffs' Motion and confirmed that their PACA trust claims were valid as to principal and interest.  (Doc. No. 186 at pp. 24-25.)  As set forth in that Order, the Court determined that the total value of Plaintiffs' PACA claims (including interest) is $1,191,691.54.  (*Id.*)

On October 2, 2020, Plaintiffs filed a Joint Motion for Partial Summary Judgment with respect to their (1) "enforcement of statutory trust provisions" of PACA and disgorgement claims, as against Defendants P.K. Produce, Debra Kasapis, George Argie and the law firm of Argie, D'Amico & Vitantonio, Magnum Express Trucking, Inc., and Strike Zone Lanes, LLC, Sipasak Properties, LLC (hereinafter referred to collectively as "the P.K. Produce Defendants"), Paul Kasapis, and 3D Logistics, LLC; and (2) PACA claims for failure to account and pay promptly as against Defendant Debra Kasapis individually.  (Doc. No. 184.)  The P.K. Produce Defendants and Paul Kasapis filed separate Briefs in Opposition on January 4, 2021.  (Doc. No. 188, 190.)  3D Logistics has not appeared in this action and, thus, did not oppose Plaintiffs' Joint Motion.

In addition, Debra Kasapis filed a Cross Motion for Partial Summary Judgment regarding Plaintiffs' claim that she is individually liable for the alleged PACA Violations at issue.  (Doc. No. 189.)  Plaintiffs filed a Combined Reply in Further Support of their Motion for Partial Summary Judgment and Brief in Opposition to Debra's Cross Motion for Partial Summary Judgment. (Doc. No. 192.)  In addition, Plaintiffs filed a Reply to Paul Kasapis's Brief in Opposition.  (Doc. No. 193.)  Defendant Debra Kasapis did not file a reply brief in support of her Cross Motion for Partial Summary Judgment.

9

### III.     Summary Judgment Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*,

10

593 Fed. Appx at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.     Statutory Framework under the PACA

     As the Sixth Circuit has explained, "PACA provides a comprehensive regulatory scheme for the sale of produce in interstate commerce."  *Six L's Packing Co., Inc. v. Beale*, 524 Fed. Appx. 148, 152 (6th Cir. April 8, 2013).  "'Under the Act, when a seller, dealer, or supplier ships produce to a buyer, a statutory trust is created upon acceptance of the commodities.'"  *Id.* (quoting *Golman–Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000)).  *See also* 7 U.S.C. §§ 499a–499t.  Specifically, the statute provides for the formation of a trust as follows:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2).

     The trust created by the above statute protects sellers of perishable agricultural commodities against financing arrangements made by merchants who encumber commodities or the proceeds thereof, thus giving sellers precedence over the claims of secured creditors.  *See e.g., Overton Distrib. v. Heritage Bank*, 340 F.3d 361, 365 (6th Cir. 2003); *J.A. Besteman Co. v. Carter's Inc.*, 439 F.Supp.2d 774, 777 (W.D. Mich. 2006).  The legislative history to the 1984 amendments to this statute explains the need to protect produce suppliers, as follows:

11

> Sellers of agricultural commodities are often located thousands of miles from their customers. Sales transactions must be made quickly or they are not made at all.... Under such conditions, it is often difficult to make credit checks, conditional sales agreements, and take other traditional safeguards.
> ....
>
> Many [buyers], in the ordinary course of their business transactions, operate on bank loans secured by [their] inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer failed to make payment as required by the contract.

H. R. Rep. No. 98–543, 98th Cong., 1st Sess. 3 (1983).  *See also Sanzone-Palmisano Co. v. M. Seaman Enterprises, Inc*., 986 F.2d 1010, 1012 (6th Cir. 1993).

Thus, PACA sought to protect produce sellers by creating "'a trust obligation ..., prior to and superior to any lien or security interest in inventory held by the [buyer's] secured lender.'" *Sanzone-Palmisano Co.*, 986 F.2d at 1012 (quoting *In re Prange Foods, Corp*., 63 B.R. 211, 214 (Bankr. W.D. Mich.1986)).  Moreover, the Sixth Circuit has explained that the PACA trust created by § 499e(c)(2) is a "floating" trust, in that it applies to all of the buyer's produce and inventory and all proceeds from the sale of produce.  *Sanzone-Palmisano*, 986 F.2d at 1012.  The trust beneficiary is therefore not obligated to trace assets.  *Id.* (stating that "the trust beneficiary is not obligated to distinguish the assets to which its trust applies from other produce-related assets.") *See also J.A. Besteman Co*., 439 F.Supp.2d at 777; *Shippers Service Co., Inc. v. Fresh Louie's Produce Co., LLC*, 2010 WL 726242 at * 2 (E.D. Mich. Feb. 24, 2010).

Produce buyers are trustees of the statutory trust and are required to maintain the trust and make full payment promptly to the trust beneficiaries, i.e., produce sellers who have perfected their PACA trust rights.  *See* 7 U.S.C. §499b(4); 7 C.F.R. §46.46(d)(1).  Further, the trustees of the PACA trust are obligated to "maintain trust assets in a manner that such assets are freely available to satisfy

12

outstanding obligations to sellers of perishable agricultural commodities.  Any act or omission which is inconsistent with this responsibility, including dissipation of the trust assets, is unlawful and in violation of [PACA]."  7 C.F.R. §46.46(d)(1).

## V.   Analysis

### A.   Enforcement of PACA Trust

In their Joint Motion for Partial Summary Judgment, Plaintiffs first argue, generally, that they are "entitled to enforce the PACA trust as an equitable and legal remedy and Judgment should be entered in Plaintiffs' favor in this regard."  (Doc. No. 184 at pp. 10-11, Doc. No. 192 at p. 4.)  Neither the P.K. Produce Defendants or Defendant Paul Kasapis respond to Plaintiffs' argument regarding this "enforcement" claim or otherwise offer any reasoned explanation as to why the PACA Trust should not be enforced in this matter.

As Plaintiffs correctly note, on October 6, 2020, this Court determined that the Plaintiffs' PACA Trust claims were valid as to principal and interest, in the total amount of $1,191,691.54.  (Doc. No. 186.)  Plaintiffs have argued (and Defendants do not contest) that less than $70,000 of P.K. Produce's assets have been collected and liquidated to date.  (Doc. No. 192 at p. 4.)  Thus, Plaintiffs assert (and Defendants do not contest) that the PACA Trust has been dissipated and depleted to Plaintiffs' detriment.  (*Id*.)  Because they have perfected PACA trust claims and the trust herein has been depleted, Plaintiffs assert that they are entitled to enforce the trust as a matter of law.

Based on the above, and the lack of opposition with regard to this specific issue, the Court finds that Plaintiffs are entitled to enforce the PACA trust herein.  The Court notes, however, that Plaintiffs do not clearly articulate the precise relief they are requesting with regard to this specific claim nor do they identify the specific counts on which they are moving for judgment with respect to

13

their "enforcement" claims.  This is problematic as there are five separate Amended Complaints in this action, which assert a combined total of fifty-four (54) counts against nine Defendants. [9]  (Doc. Nos. 97, 104, 105, 106, 108.)  (*Id.*)

In light of Plaintiffs' failure to clearly identify the specific counts on which they are moving, the Court is not inclined to "enter judgment" in Plaintiffs' favor with respect to the generalized "enforcement" claim argued in their Joint Motion for Partial Summary Judgment.  Nonetheless, the Court does find, for the reasons set forth above and in this Court's October 6, 2020 Memorandum Opinion & Order, that Plaintiffs herein have valid and perfected PACA Trust claims in the amounts set forth in that Opinion and are, therefore, entitled to enforce the statutory trust provisions of the PACA with respect thereto. [10]

### B.    Disgorgement Claims

In their various Complaints, Plaintiffs allege claims of dissipation of trust assets, disgorgement, and/or unlawful retention against Defendants P.K. Produce, Debra, Paul, Magnum Express, Strike Zone Lanes, Sipasak Properties, and 3D Logistics.  *See* Doc. No. 97 (Counts IV, VIII); Doc. No. 104 (Counts II, VI-IX); Doc. No. 105 (Counts VII-IX, XI-XIII); Doc. No. 106 (Count VII); Doc. No. 108 (Counts VIII-XI).  In addition, Plaintiff R&R Produce asserts a disgorgement

---

[9] Not all of the complaints in this action clearly allege claims for "enforcement of the statutory trust provisions of PACA." *See, e.g*, Doc. No. 104.  Moreover, in at least one of the complaints that does clearly allege such a claim (i.e., Plaintiff R&R Produce's Amended Complaint, Count IV), the complaint combines that plaintiff's enforcement claim with its disgorgement claims into one count.  (Doc. No. 97 at pp. 11-12.)  In their Joint Motion, Plaintiffs appear to treat the instant "enforcement" claim as a separate claim and seek judgment in their favor with regard thereto.  Plaintiffs' disgorgement claims are briefed separately in the Joint Motion and are addressed below, *infra*.

[10] Plaintiffs are advised that, in any future dispositive motions filed in this action, they should clearly identify the relief that they are requesting and the specific Counts on which they are moving.  In addition, Plaintiffs are reminded of their obligation to comply with the requirements of Local Rule 7.1(f), which provides, in pertinent part, that "[a]ll memoranda exceeding fifteen (15) pages in length . . . must have a table of contents, a table of authorities cited, a brief statement of the issue(s) to be decided, and a summary of the argument presented."

claim against Defendants George Argie and the law firm of Argie, D'Amico & Vitantonio.  *See* Doc.
No. 97 (Counts IV, VIII).

In their Joint Motion, Plaintiffs seek summary judgment in their favor with respect to these
claims.  (Doc. No. 184 at pp. 12-13.)  Citing various bank records and deposition testimony, Plaintiffs
argue that a total of $285,441.12 was distributed from P.K. Produce to the P.K. Produce Defendants
between June and December 2018, in violation of the PACA Trust.  (*Id.* at pp. 5-7.)  Plaintiffs further
assert that (1) $70,271 was improperly distributed from P.K. Produce to Defendant Paul Kasapis in
December 2018; and (2) a total of 22 vehicles were improperly transferred from either P.K. Produce
or Magnum Express to Defendant 3D Logistics in January 2019.  (*Id.* at p. 6-7.)

The Court will discuss Plaintiffs' disgorgement claims with respect to each of the Defendants
separately, below.

### 1.    Defendant Debra Kasapis

Plaintiffs assert disgorgement claims against Defendant Debra Kasapis in the total amount of
$131,221.10.  (Doc. No. 184 at p. 5.)   These claims are based on banking records showing (1) seven
checks dated between June 26, 2018 and October 20, 2018, from the P.K. Produce account to Debra
Kasapis and/or "cash;" (2) seventeen cash withdrawals from the P.K. Produce account between July
14, 2018 and December 14, 2018; and (4) four online transfers from the P.K. Produce account
between July 31, 2018 and December 7, 2018.  (Doc. No. 184-9.)  Plaintiffs maintain that Debra
should be required to disgorge these funds because they were transferred to her "during the time
period when amounts were owed on the PACA Trust Claims at issue with actual or constructive
knowledge of the breach of trust."  (Doc. No. 184 at p. 2.)

15

With regard to the checks and cash withdrawals noted above, Debra does not dispute that the funds at issue are PACA trust funds.  Rather, Debra asserts that the checks and cash withdrawals at issue were "legitimate expenditures in the ordinary course of the business activities of P.K. Produce," including for fuel, truck driver compensation, parts, PACA licensing expenses, union dues and insurance, satisfaction of debts to non-party produce sellers, and upkeep at the P.K. Produce unit at the Food Terminal.  (Doc. No. 188 at pp. 11-13.)  Without citing any supporting legal authority, Debra appears to argue that, because these monies were used for P.K. Produce's business expenses, Plaintiffs are not entitled to summary judgment in their favor with respect to these particular disgorgement claims.[11]  (*Id.*)

In response, Plaintiffs assert that, as a PACA trustee, Debra was obligated to maintain the trust assets so as not to impair the ability of the beneficiaries to collect money owed in connection with produce sales.  (Doc. No. 192 at p. 5.)  Plaintiffs argue that, by diverting P.K. Produce funds to herself when monies were due and owing to the Plaintiffs, Debra "wholly failed in her fiduciary capacity as trustee of the PACA trust" and should be ordered to disgorge the diverted funds as a matter of law.[12]  (*Id.* at pp. 5-6.)

---

[11] The Court notes that, in her Brief in Opposition, Debra specifically addresses each of the checks, withdrawals, and online transfers at issue individually, with the exception of Check No. 6118.  This check is dated August 20, 2018 and is from the P.K. Produce account to Debra in the amount of $3,200.  As Debra does not directly contest this check, the Court deems Debra as having waived any opposition to Plaintiffs' argument that she is required to disgorge this particular sum.

[12] The parties' briefing has created some confusion regarding the nature of the Plaintiffs' claims against Debra with respect to these particular transactions.  In their Motion, Plaintiffs state that they are moving for summary judgment on the *disgorgement* claims against the various defendants, including Debra. In their Brief in Opposition, however, Defendants appear to be treating all the disgorgement claims against the P.K. Produce Defendants as breach of fiduciary duty claims against Debra.  The Court clarifies that, as to the particular transactions identified in Section II.A of Plaintiffs' Motion (titled "Disgorgement Claims Against Various Defendants"), the Court construes Plaintiffs' Motion as seeking summary judgment on their disgorgement claims and will, thus, apply the law regarding disgorgement of PACA funds to third-party transferees.

16

General principles of trust law govern PACA trusts unless those principles conflict with PACA. *Nickey Gregory Company LLC v. AgriCap LLC*, 597 F.3d 591, 595 (4th Cir. 2010). *See also Arava USA Inc. v. Karni Family Farm, LLC,* 474 Fed. Appx. 452, 453 (6th Cir. 2012); *Brinager v. Jao Distributors, Inc*., 2015 WL 4910970 at * 19 (S.D. Ohio Aug. 10, 2015). "PACA does not impose explicit obligations upon, or provide explicit remedies against, third–party transferees who receive trust property in breach of trust." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp*., 155 F.3d 612, 615 (2d Cir. 1998).  However, "when trust assets are held by a third party, resulting in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, the third party may be required to disgorge the trust assets unless the third party can establish that it has some defense, such as having taken the assets as a *bona fide* purchaser[.]" *Nickey Gregory*, 597 F.3d at 595–96. *See also Meuers Law Firm, P.L. v. Reasor's LLC*, 796 Fed. Appx. 472, 482 (10th Cir. 2019).

Here, the record reflects that Debra transferred over $112,000 in cash from P.K. Produce to herself (via check and/or cash withdrawal) between June and December 2018.  It is undisputed that, during this time period, P.K. Produce had outstanding payment obligations to Plaintiffs herein for produce sales.  Rather than use the PACA trust funds to satisfy these payment obligations, Debra withdrew this substantial sum of money and transferred it to herself.  Thus, unless Debra can establish that she has a defense, the Court may require her to disgorge these monies.

Debra's defense appears to be that disgorgement is not warranted because she used these monies to pay for "legitimate" P.K. Produce expenses that were "incurred in the ordinary course of business." (Doc. No. 188 at pp. 11-13.)  The Court disagrees.  As Plaintiffs correctly note, PACA trustees are obligated to "maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 C.F.R.

17

§46.46(d)(1).  PACA regulations further provide that "[a]ny act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful." *Id*.  "Dissipation" is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." 7 C.F.R. § 46.46(a)(2).  *See also Coosemans Specialties, Inc. v. Garguilo*, 485 F.3d 701, 706 (2nd Cir. 2007).

Citing this language, courts have noted that "[a] PACA trustee may use trust assets to pay ordinary business expenses *as long as* it does not do so at the expense of its PACA beneficiaries, or in any way impair the ability of the beneficiaries to collect money owed in connection with produce sales." *C.H. Robinson Co. v. Alanco*, 239 F.3d 483, 488 (2nd Cir. 2001) (citing Department of Agriculture Explanation of the Regulations under PACA, 49 F.R. 45735, 45738) (emphasis added). *See also Morris Okun, Inc. v. Harry Zimmerman, Inc*., 814 F. Supp. 346, 348 (S.D.N.Y. 1993) ("We recognize at the outset that a PACA trust in effect imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier.  This includes use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment of rent, payroll, or utilities.")

Here, Plaintiffs have established that Debra used PACA trust assets at the expense of P.K. Produce's PACA Claimants (including Plaintiffs herein) by impairing these Claimants' ability to collect monies owed in connection with produce sales.  Under these circumstances, the Court finds that Debra improperly dissipated PACA trust assets.  The Court, therefore, rejects Debra's argument that she should not be required to disgorge these sums because she used the money to pay P.K. Produce's business expenses.

18

Debra could also defeat Plaintiffs' disgorgement claim by establishing that she took the payment as a *bona fide* purchaser. A *bona fide* purchaser is one who takes trust property "for value and without notice of breach of trust." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995) (quoting Restatement (Second) of Trusts § 284 (1959)). *See also In re Arctic Exp., Inc.*, 636 F.3d 781, 801 (6th Cir. 2011); *Brinager*, 2015 WL 4910970 at * 19. "A third–party transferee may escape liability, therefore, if it: (i) gave value for the trust property and (ii) had no actual or constructive notice of the breach of trust." *Albee Tomato*, 155 F.3d at 615. The burden of proof in establishing the protected status of a *bona fide* purchaser is on the transferee. *Id*.

Debra does not make any reasoned argument, however, that she constitutes a *bona fide* purchaser. Moreover, even if her Brief in Opposition could be interpreted as making such an argument, the Court would find it to be without merit. "A person has notice of a breach of trust if he knows or should know of the breach of trust." *Brinager*, 2015 WL 4910970 at * 20 (citing Restatement (Second) of Trusts § 297.) *See also Albee Tomato, Inc*., 155 F.3d t 615-616; *Brinager*, 2015 WL 4910970 at * 20. Here, it is undisputed that, at the time of the checks and cash withdrawals at issue, Debra was the sole owner of P.K. Produce and a signatory on its checking account. As such, and in the absence of any meaningful argument to the contrary, the Court has no difficulty concluding that Debra knew or should have known of the breach of trust at the time she wrote the checks and made the cash withdrawals at issue.

Lastly, Plaintiffs seek summary judgment in their favor with regard to their claims that Debra should be required to disgorge the $18, 840 diverted from P.K. Produce's account via the four online transfers identified in Plaintiffs' Motion. (Doc. No. 184-9 at PageID# 3443.) Debra asserts that she should not be required to disgorge these monies because she "does not recall ever making such an

19

online transfer" and that she has "good reason to believe that all of these transfers were most likely conducted by [Heestand], at the instruction of Paul." (Doc. No. 188 at p. 13.) In response, Plaintiffs assert that it is not a defense that "Debra 'doesn't remember' making four online transfers of PACA trust assets . . . from the P.K. Produce, Inc. account to her personal bank accounts [because] she does not dispute that the funds were deposited into her personal accounts." (Doc. No. 192 at p. 5.)

For the following reasons, the Court finds that Plaintiffs are entitled to summary judgment in their favor with respect to the disgorgement claims relating to these four online transfers. Although Debra states that she does not recall having made these transfers, she does not dispute that the bank accounts to which the $18,840 at issue was transferred were, in fact, her personal bank accounts.[13] Thus, even assuming *arguendo* that it was Heestand who made these online transfers, there is no dispute that the $18,840 was transferred to Debra's personal bank accounts. Debra does not argue, or direct this Court's attention to any evidence, that these monies were then somehow transferred or withdrawn from her personal bank account by either Heestand or Paul without her knowledge or consent. Nor does she argue that she should not be required to disgorge these funds because she constitutes a *bona fide* purchaser. Under these circumstances, the Court agrees with Plaintiffs that Debra is required to disgorge the $18,840 diverted from P.K. Produce's account to her personal bank accounts via the four online transfers at issue.

---

[13] The bank records attached to Plaintiffs' Joint Motion indicate that the online transfers at issue were to bank accounts identified as "8157" and "3351." (Doc. No. 184-9.) It is not apparent from the face of these bank records that these specific accounts were Debra's personal bank accounts. (*Id*. at PageID#s 3455-3453, 3467, 3470, 3478.) In her Brief in Opposition, however, Debra does not dispute that these particular online transfers were made to her personal bank accounts.

Accordingly, and for all the reasons set forth above, summary judgment is granted in favor of Plaintiffs with respect to their disgorgement claims against Debra, in the total amount of $131, 221.10.

### 2.   Defendant Paul Kasapis

Plaintiffs assert disgorgement claims against Defendant Paul Kasapis in the total amount of $101, 930.00.  (Doc. No. 184 at p. 6.)  These claims are based on banking records showing a series of withdrawals by Paul from P.K. Produce accounts at Citizens Bank and Key Bank between February 2, 2018 and May 25, 2018, in the total amount of $31,659.  (Doc. No. 184-10 at PageID#s 3483-3495.)  In addition, Plaintiffs rely on Debra's deposition testimony that, on December 14, 2018, she authorized an electronic withdrawal to Ahola payroll services in the amount of $70,271 for payment to Paul "for money he was owed prior to going to prison."  (Doc. No. 184-10 at PageID#s 3496-3499.)

In his Brief in Opposition, Paul "concedes that he received $31,659 between February and June 19, 2018 while operating the company."  (Doc. No. 190 at p. 2.)  However, he "vigorously disputes" Plaintiffs' claim with regard to the $70, 271 allegedly paid to him by Ahola payroll services on December 14, 2018.  (*Id*.)  Specifically, Paul asserts that there is a genuine issue of material fact with respect to whether he should be required to disgorge the $70,271 payment because (1) he was neither aware of, or in a position to control, the payment because he was in federal prison at the time; (2) the funds were deposited into an account held jointly by Debra and himself; and (3) the funds were withdrawn by Debra and "long gone by the time that Paul was released from prison in August 2019."  (*Id*.)  *See also* Declaration of Paul Kasapis (Doc. No. 190-1) at ¶¶ 6-15.  Paul further avers that he "had nothing whatsoever to do with the decision for P.K. Produce to issue the $70,271

21

payment;" did not "access, use, or direct the use of the $70,271 payment;" and "did not benefit from this transfer—either directly or indirectly."  (Doc. No. 190-1 at ¶¶ 13, 14.)  Thus, Paul argues that he did not "take" this money from P.K. Produce and, therefore, cannot be held liable for the return of thereof under disgorgement principles.   (Doc. No. 190 at p. 10-12.)

In response, Plaintiffs first assert that the evidence shows that Paul did, in fact, maintain frequent contact with both Debra and Heestand regarding P.K. Produce business matters while he was incarcerated, including by phone, text, and email.  (Doc. No. 193 at p. 8.)  Plaintiffs emphasize that Paul was a co-owner of the bank account in which the $70, 271 was deposited and, therefore, he benefitted from this payment because it was likely used for household and other joint expenses that he shared with Debra.  (*Id*. at p. 8-9.)  Plaintiffs maintain that Paul does not qualify as a *bona fide* purchaser because (1) "there was no value given by Debra when Paul transferred his P.K. Produce stock to Debra;" and (2) Paul knew or should have known about the breach of the PACA trust at the time of the December 2018 payment.  (*Id*. at p. 7-9.)  Finally, Plaintiffs argue (summarily and for the first time in their Reply Brief) that "this Court should enter Judgment against Paul and Debra jointly and severally, for the $70,271 deposited into their joint checking account."  (*Id.* at p. 9.)

As an initial matter, the Court finds that Plaintiffs are entitled to summary judgment in their favor with respect to their disgorgement claim against Paul for the $31, 659 in withdrawals made by Paul from P.K. Produce accounts at Citizens Bank and Key Bank between February 2, 2018 and May 25, 2018.  Paul expressly concedes liability for these withdrawals and, thus, Plaintiffs are entitled to summary judgment in their favor with respect thereto.

However, for the following reasons, the Court finds that Plaintiffs are not entitled to summary judgment in their favor with respect to the $70, 271 payment.  The undisputed facts relevant to this

claim are as follows.  In December 2018, Debra authorized an electronic withdrawal to Ahola payroll services in the amount of $70, 271.  (Doc. No. 175-1 at Tr. 114-115.)  The parties do not dispute that this money was then deposited into Paul and Debra's joint checking account.  At the time of this payment, Paul had already transferred his entire interest in P.K. Produce to Debra and was in federal prison.  P.K. Produce had closed operations two months previously (in October 2018) with a significant amount of money due and owing to various creditors, including Plaintiffs herein.  The instant lawsuit had been filed in this Court (in November 2018) to recover that money. Thus, the Court agrees with Plaintiffs that the PACA Trust herein was dissipated by the $70, 271 payment to Paul and Debra's joint checking account.

The question, however, is whether Plaintiffs have demonstrated that *Paul* should be required to disgorge this money.  In this regard, the Court first notes that Plaintiffs moved for summary judgment on this disgorgement claim as to Paul only.  Nowhere in their initial Motion did Plaintiffs assert that they were entitled to judgment against Debra for disgorgement of this particular payment, despite the fact that they were presumably aware that the money had been deposited into a joint account.  It was not until their Reply Brief that Plaintiffs first asserted that Debra and Paul should be held jointly and severally liable under PACA for this $70, 271 payment.[14] (Doc. No. 192 at p. 6.)

It is well established, however, that courts will not normally consider issues raised for the first time in Reply Briefs, as it deprives the non-movant of a full and fair opportunity to respond.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir.2008) (explaining that "reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new

---

[14] Plaintiffs do not cite any legal authority in support of their argument that joint and several liability would be appropriate under PACA under the circumstances presented.

23

opportunity to present yet another issue for the court's consideration") (emphasis in original); *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F.3d 662, 676 (6th Cir. 2006). Here, Plaintiffs did not argue that Debra should be held jointly and severally liable for disgorgement of the $70,271 payment in their Motion for Partial Summary Judgment. This argument was raised for the first time in Plaintiffs' Reply Briefs (Doc. No. 192 at p. 6; Doc. No. 193 at p. 9), thus depriving Debra of a full and fair opportunity to respond.[15] Accordingly, the Court finds that Plaintiffs waived the argument that Debra is jointly and severally liable as to this particular disgorgement claim and the Court will not consider it herein.

This leaves the question of whether Plaintiffs are entitled to summary judgment on their claim that Paul is required to disgorge these funds. For the following reasons, the Court finds that they are not. As an initial matter, the parties do not dispute that, at the time of the December 2018 transfer, Paul was a third party, as opposed to a trustee of the PACA trust. As noted above, "PACA does not impose explicit obligations upon, or provide explicit remedies against, third–party transferees who *receive* trust property in breach of trust." *Albee Tomato, Inc.*, 155 F.3d at 615 (emphasis added). However, "when trust assets are *held by* a third party, resulting in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, the third party may be required to disgorge the trust assets unless the third party can establish that it has some defense, such as having taken the assets as a *bona fide* purchaser[.]" *Nickey Gregory*, 597 F.3d at 595–96 (emphasis added) A *bona*

---

[15] Although Plaintiffs did not seek disgorgement from Debra for this payment in their Joint Motion, the Court notes that Debra nonetheless argued, generally, in her Brief in Opposition that she should not be required to disgorge the $70, 271 payment because she "was instructed by Paul Kasapis to have this payment made to him because he claimed that it was owed to him by P.K. Produce prior to him going to prison." (Doc. No. 188 at p. 14.) However, Debra did not have the opportunity to respond to the various arguments and evidence offered in support of joint and several liability for this payment set forth in Plaintiffs' Reply Brief.

*fide* purchaser is one who *takes* trust property "for value and without notice of breach of trust." *Endico*

*Potatoes, Inc.*, 67 F.3d at 1068 (emphasis added).

Under these principles, to be entitled to an order of disgorgement of the funds at issue,

Plaintiffs must first necessarily demonstrate that the funds at issue were received, held and/or taken

by Paul.  Here, Paul avers that he did not, in fact, receive, hold or take these funds, as follows:

> 10.    I understand that the funds were debited from P.K. Produce's account by the company's payroll service. The funds were then deposited into a joint bank account held by Debra Kasapis and me.
>
> **11.    Following the direct deposit, Debra Kasapis withdrew the $70, 271 (and other funds) from that account. She then removed her name from the account and left the account titled in my name alone.**
>
> **12.    I learned all of this following my release from prison in August 2019, eight months after these events occurred.**
>
> **13.    I had nothing whatsoever to do with the decision for P.K. Produce to issue the $70, 271 payment. I did not know about this transaction until months after my release from prison, I was not involved in the decision to issue this payment  from P.K. Produce, and most importantly, I had no access to the funds either before or after they were paid by P.K. Produce.**
>
> 14.    At no time did I access, use, or direct the use of the $70,271 payment from P.K. Produce, and I did not benefit from this transfer – either directly or indirectly.
>
> 15.    No one at P.K. Produce, including Debra Kasapis, informed me of this transfer. As stated above and in my deposition, I knew nothing about this transaction until after my release from prison in August 2019.

(Doc. No. 190-1) (emphasis added).  Thus, Paul has come forward with evidence that (1) he did not

direct that the $70, 271 be deposited into his joint checking account, i.e., that he did not "take" this

money; (2) he did not hold this money in his joint account (because Debra withdrew it); and (3) he

did not otherwise receive this money from the P.K. Produce account.  (*Id.*)  Debra, on the other hand,

has both testified and averred that she was directed by Paul to make the $70, 271 payment "to him"

25

and that she did so.  (Doc. No.  188-2 at ¶ 23.)  Plaintiffs have not directed this Court's attention to any documentary evidence or deposition testimony that resolves this factual dispute. [16]

In light of the above, the Court finds that there is a genuine issue of material fact regarding whether the $70, 271 payment at issue was received, held, or taken by Paul.  Accordingly, Plaintiffs are not entitled to summary judgment in their favor with respect to their disgorgement claim against him for this $70, 271 payment.

### 3.      Defendant Sipasak Properties

Plaintiffs assert disgorgement claims against Defendant Sipasak Properties in the total amount of $10, 350.00.  (Doc. No. 184 at p. 6.)  These claims are based on banking records showing an online transfer on November 26, 2018 in that amount from the P.K. Produce account to an account identified as "6177."  (Doc. No. 184-15.)

In response, Defendant Sipasak Properties does not dispute that account 6177 is, in fact, its bank account.  (Doc. No. 188 at p. 17.)  Rather, Debra (who is currently the owner of Sipasak Properties) appears to aver that these funds were transferred to Sipasak Properties essentially as reimbursement for funds that Paul had previously withdrawn from Sipasak Properties bank accounts to pay for upkeep at the P.K. Produce terminal.  (*Id*. at pp. 17-18.)  Specifically, Debra avers that "[i]t is [her] belief . . . that these transfers [sic] were for work that was performed at the P.K. Produce unit

---

[16] Plaintiffs have asked this Court to disregard that portion of Paul's Declaration in which he avers that, during the 13 months that he was incarcerated, he did not have the ability to conduct business, including phone calls, emails, online banking, transfers of money or phone banking.  The Court agrees that this general statement is inconsistent with Paul's deposition testimony.  *See* P. Kasapis Depo. (Doc. No. 173-1) at Tr. 81-84 (testifying generally that he communicated with Debra and Heestand via email and telephone while he was incarcerated).  However, Plaintiffs have not directed this Court's attention to any evidence that Paul directed Debra to transfer the specific $70, 271 payment at issue to him from P.K. Produce's account.  Indeed, to the contrary (and consistent with his Declaration), Paul testified in deposition that he did not know who transferred the $70, 271 to the joint checking account and that, by the time he got out of prison, that deposit "was no longer there." (*Id*. at Tr. 135-136.)

26

at the Northern Ohio Food Terminal, including for electrical, plumbing, flooring and/or roofing which, to the best of her recollection Paul Kasapis had on one or more occasion paid out of one or more of the Sipasak bank accounts."  (Doc. No. 188-2 at ¶ 27.)  In response, Plaintiffs argue that "Debra and/or Sipasak Properties" must disgorge these funds because "the law prohibits the use of PACA trust assets when that usage impairs the ability to pay PACA trust beneficiaries."  (Doc. No. 192 at p. 9.)

For the following reasons, the Court grants summary judgment in Plaintiffs' favor against Sipasak Properties[17] with respect to this claim.  It is not disputed that the funds at issue constitute PACA trust assets.  The payment at issue was made on November 26, 2018 from the P.K. Produce checking account, at which time P.K. Produce had outstanding payment obligations to Plaintiffs herein for produce sales.  Thus, payment of this sum at that time resulted in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, including Plaintiffs.  Accordingly, Sipasak Properties may be required to disgorge this payment unless it can establish that it took the payment as a *bona fide* purchaser.

As has been previously noted, a *bona fide* purchaser is one who takes trust property "for value and without notice of breach of trust."  *Endico Potatoes, Inc.*, 67 F.3d at 1068.  Sipasak Properties does not make any reasoned argument that it constitutes a *bona fide* purchaser.  Even if Sipasak Properties' one-sentence response could be liberally construed as asserting such an argument, it would be without merit.  As noted previously, "[a] person has notice of a breach of trust if he knows

---

[17] In their Joint Motion for Summary Judgment, Plaintiffs move for judgment in their favor with respect to this particular claim against Defendant Sipasak Properties only.  Plaintiffs' attempt to obtain judgment against *Debra* with respect to this claim is raised for the first time in their Reply Brief and, therefore, will not be considered for the reasons discussed *supra*.

27

or should know of the breach of trust." *Brinager,* 2015 WL 4910970 at * 20 (citing Restatement (Second) of Trusts § 297.) *See also Albee Tomato, Inc.*, 155 F.3d at 615-616. Here, it is undisputed that, at the time of the November 26, 2018 payment, Sipasak Properties was owned by Debra, who was then the sole owner of P.K. Produce and a signatory on the P.K. Produce account. *See* Dec. 30, 2020 Decl. of D. Kasapis (Doc. No. 188-2) at ¶ 2. As such, and in the absence of any meaningful argument to the contrary, the Court concludes that Sipasak Properties knew or should have known of the breach of the trust at the time it accepted the $10, 350 payment at issue.

Accordingly, the Court finds that Plaintiffs are entitled to summary judgment in their favor with respect to their disgorgement claim against Sipasak Properties for the $10, 350 payment made from the P.K. Produce account on November 26, 2018.

### 4. Defendant Magnum Express Trucking

Plaintiffs next assert disgorgement claims against Defendant Magnum Express Trucking (hereinafter "Magnum") in the total amount of $58, 245.50. (Doc. No. 184 at p. 6.) These claims are based on bank records showing (1) electronic transfers from P.K. Produce to account "8239" on October 12, 2018 and October 25, 2018 in the total amount of $36, 808.00; and (2) three checks from Shaffers Produce, Inc. to "P.K. Produce or Magnum Express" dated November 7 and 21, 2018 and December 6, 2018 in the total amount of $21, 437.50. (Doc. No. 184-12.)

The Court first addresses the October 2018 electronic transfers from P.K. Produce to account 8239 in the total amount of $36, 808.00. With regard to these transfers, Magnum does not dispute that account 8239 is, in fact, its bank account. (Doc. No. 188 at p. 14.) Magnum argues, however, that it should not be required to disgorge this sum because:

> On 10/12/2018 and 10/25/2018, when the $36,808.00 in electronic transfers were
> made from the P.K. Produce account to the Magnum Trucking account, Jeff Heestand

28

was operating Magnum Trucking; Debra Kasapis does not recall ever making such an online transfer; furthermore, both Debra and Jeff Heestand had the authority and the ability to make such online transfers; furthermore, to the best of Debra's knowledge, there was only one set of codes that were used to access the Chase Bank account online, and Debra, Jeff Heestand, and Paul Kasapis were all aware of these access codes; furthermore, since all of these computer transactions appear to have been performed while Paul Kasapis was in federal prison, and since Debra is aware that while Paul was in prison he spent many hours on the phone with Jeff, it is her position that all of these transfers were most likely conducted by Jeff, at the instruction of Paul. As further support for this proposition, Debra Kasapis states that Jeff Heestand had the same authority that Debra had relative to the P.K. Produce bank account, and on occasion he would write company checks using Debra's name, and he would sign her name, thereby falsely representing Debra as the maker, and thereby making it all the more likely that all of these challenged transactions were conducted by Jeff.

(*Id.* at p. 14.)

Magnum's argument misses the point.  Plaintiffs' claims regarding these transfers are disgorgement claims against *Magnum* (as a third-party transferee of PACA Trust Assets) and not claims against Debra, Paul, or Heestand.  Magnum has not cited any authority that, for purposes of this claim, it matters whether it was Debra, Paul, or Heestand that authorized these transfers from the PACA Trust.  Indeed, the Court finds that it does not.  Here, it is undisputed that the funds at issue are PACA Trust assets and that they were transferred from the P.K. Produce account to Magnum in October 2018.  At that time, P.K. Produce had outstanding payment obligations to Plaintiffs for produce sales.  Thus, the transfer of this money at that time (regardless of who authorized the transfer) resulted in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, including Plaintiffs herein.  Accordingly, as a third party, Magnum may be required to disgorge this money unless it can establish that it took the payment as a *bona fide* purchaser.  *See Nickey Gregory*, 597 F.3d at 595–96; *Endico Potatoes, Inc.*, 67 F.3d at 1068.

Magnum does not argue that it constitutes a *bona fide* purchaser, i.e., that it accepted the $36,808 in electronic transfers for value and without notice of breach of the trust.  *Endico Potatoes, Inc.*,

29

67 F.3d at 1068.  Moreover, even if Magnum had made such an argument, it would be without merit. At the time of the October 2018 transfers, Magnum was owned by Debra, who was then the sole owner of P.K. Produce and a signatory on P.K. Produce's checking account. *See* Dec. 30, 2020 Decl. of D. Kasapis (Doc. No. 188-2) at ¶ 2.  As such, the Court concludes that Magnum knew or should have known of the breach of the trust at the time it accepted the $36, 808 in electronic transfers at issue.  Accordingly, the Court finds that Plaintiffs are entitled to summary judgment in their favor with respect to their disgorgement claim against Magnum for the $36, 808 in electronic transfers made from the P.K. Produce account in October 2018.

The Court next addresses the three checks from Shaffers Produce, Inc. to "P.K. Produce or Magnum Express" dated November 7 and 21, 2018 and December 6, 2018 in the total amount of $21, 437.50.  (Doc. No. 184-12 at PageID#s 3511-3513.)  With regard to these checks, Magnum does not dispute that these sums were, in fact, diverted (i.e., deposited) into Magnum's account.  (Doc. No. 188 at p. 15.)  Rather, Magnum argues that "it is Debra's position that all of these checks were diverted/altered by Jeff Heestand, at the instruction of Paul Kasapis, in order for Jeff to continue to receive his unauthorized compensation and alleged business expense reimbursement after the doors of P.K. Produce had closed."  (*Id.*)

Again, Magnum does not cite any authority suggesting that, for purposes of this disgorgement claim, it matters whether it was Debra or Heestand that diverted these checks to Magnum's bank account.  Here, it is undisputed that the funds at issue are PACA Trust assets and that they were transferred to Magnum in November and December 2018, when P.K. Produce had outstanding payment obligations to Plaintiffs herein for produce sales.  Thus, the payment of this money to Magnum (regardless of who authorized it) resulted in the failure of the trustee to pay unpaid sellers

of perishable agricultural commodities, including Plaintiffs herein.  Accordingly, as a third party,

Magnum may be required to disgorge this money unless it can establish that it took the payment as a

*bona fide* purchaser.  *See Nickey Gregory*, 597 F.3d at 595–96; *Endico Potatoes, Inc.*, 67 F.3d at

1068.  Magnum makes no such argument and, even if it had, it would be without merit for the reasons

discussed above.  Accordingly, the Court finds that Plaintiffs are entitled to summary judgment in

their favor with respect to their disgorgement claim against Magnum for the $21, 437.50 in checks

diverted from the P.K. Produce account in November and December 2018.

### 5.    Disgorgement from Debra for funds transferred to her from Magnum

In their Joint Motion for Partial Summary Judgment, Plaintiffs state (summarily) that "[i]t is

noteworthy that from 8/27/18 thru 8/15/19, there were online transfers to Debra's account totaling

$3,775.00 from Magnum."  (Doc. No. 184 at p. 6.)  Plaintiffs then cite generally to certain bank

records attached to their Motion.  (Doc. No. 184-13.)  These records show that, between August 2018

and August 2019, there were six electronic transfers from Magnum's bank account to accounts

identified only as accounts 8157, 5777, 3351, and 5530.  (*Id.*)  Plaintiffs do not provide any further

discussion or explanation regarding these transfers.

Debra interprets this statement in Plaintiffs' Motion as asserting a disgorgement claim against

her for these six electronic transfers.  (Doc. No. 188 at p. 15-17.)  Debra notes that "[t]he legal and

factual basis in support of this particular disgorgement is not entirely clear, and it is not explained in

any detail in Plaintiffs' motion." (*Id*. at p. 15.)  Attempting to rebut several possible bases for such a

claim, she then argues that Plaintiffs are not entitled to judgment in their favor for such a

disgorgement claim because (1) the funds at issue were in Magnum's account and, therefore, are not

PACA trust funds; and (2) the funds are not "tainted" as at least $2,600 of the funds were placed into

31

Magnum's account before the monies discussed above in Section V.B.4 were transferred from P.K. Produce to Magnum.  (*Id*.)

For the following reasons, the Court finds that Plaintiffs failed to sufficiently raise or argue this purported disgorgement claim against Debra in their Joint Motion.  The sole sentence relating to this claim states only that Plaintiffs find the six electronic transfers at issue to be "noteworthy." Plaintiffs do not expressly state that they are asserting a disgorgement claim against Debra based on these transfers nor do they make any attempt to explain either the factual or legal basis for any such claim in their Motion.[18]  Under these circumstances, the Court finds that Plaintiffs waived any claim and/or argument regarding these six electronic transfers from Magnum's account.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (*quoting Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir.1995))). *See also Montgomery v. Kraft Foods Global*, 822 F.3d 304, 312 (6th Cir. 2016).

Accordingly, to the extent Plaintiffs intended to seek summary judgment in their favor with respect to a disgorgement claim against Debra based on these six electronic transfers from Magnum, the Motion is denied.

**6.     Defendant Strike Zone Lanes**

---

[18] Although Plaintiffs belatedly attempt to articulate a legal basis for this claim in their Reply Brief, the Court will not consider these arguments because Plaintiffs failed to either sufficiently move for judgment on this claim or assert any legal arguments in support of such a claim in their Motion.

Plaintiffs next assert disgorgement claims against Defendant Strike Zone Lanes (hereinafter "Strike Zone") in the total amount of $3, 918.04. (Doc. No. 184 at p. 6.) These claims are based on (1) bank records and deposition testimony showing that $2,893.04 was transferred from P.K. Produce to Strike Zone on July 18, 2018 to meet its payroll; and (2) bank records showing that Debra wrote a check to herself from the P.K. Produce account on June 26, 2018 in the amount of $1,025. 00. (Doc. No. 184-14.)

The Court first addresses the $2,893.04 payment. With regard to this payment, Strike Zone argues as follows:

> On 7/18/2018, a wire transfer in the amount of $2,893.04 was made from P.K. Produce account 0278; at the time of this transaction Debra was in Florida, and does not recall making such an online transfer; furthermore, it is Debra's belief that either (1) the Strike Zone account may not have had sufficient funds to cover payroll, and as a result Chase bank automatically wire-transferred the funds from P.K. Produce account 0278 to the Strike Zone account to cover this shortfall, or (2) that Jeff Heestand did this wire transfer on his own, without consulting with Debra.

(Doc. No. 188 at p. 17.) In response, Plaintiffs argue that, regardless of whether Chase Bank automatically wired this money to Strike Zone or Heestand authorized this transfer, "this intentional diversion of trust funds is violative of PACA." (Doc. No. 192 at p. 9.)

The Court agrees with Plaintiffs. Here, the payment at issue was made on July 18, 2018 from the P.K. Produce checking account. At this time, P.K. Produce had outstanding payment obligations to Plaintiffs herein for produce sales. Thus, payment of this sum at that time (regardless of who authorized it) resulted in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, including Plaintiffs herein. Accordingly, as a third party, Strike Zone may be required to disgorge this payment unless it can establish that it took the payment as a *bona fide* purchaser. *See Nickey Gregory*, 597 F.3d at 595–96; *Endico Potatoes, Inc.*, 67 F.3d at 1068.

33

Strike Zone does not argue that it constitutes a *bona fide* purchaser, i.e., that it took the $2,893.04 payment for value and without notice of breach of the trust. *Endico Potatoes, Inc.*, 67 F.3d at 1068. Moreover, even if Strike Zone had made such an argument, it would be without merit. It is undisputed that, at the time of the July 18, 2018 payment, Strike Zone was owned by Debra, who was then the sole owner of P.K. Produce and a signatory on its checking account. *See* Dec. 30, 2020 Decl. of D. Kasapis (Doc. No. 188-2) at ¶ 2. As such, the Court concludes that Strike Zone knew or should have known of the breach of the trust at the time it accepted the $2,893.04 payment at issue. Accordingly, the Court finds that Plaintiffs are entitled to summary judgment in their favor with respect to their disgorgement claim against Strike Zone for the $2,893.04 payment made from the P.K. Produce account on July 18, 2018.

The Court finds, however, that Plaintiffs are not entitled to summary judgment in their favor with regard to their disgorgement claim against Strike Zone for $1,025.00. As noted above, this claim is based on bank records showing that Debra wrote a check to herself from the P.K. Produce account on June 26, 2018 in the amount of $1,025.00. (Doc. No. 184-14 at PageID# 3539.) This check is numbered 2291 and has the phrase "AEP repay" in the Memo line. (*Id.*) There is no indication from the bank records attached as Exhibit M to Plaintiffs' Motion or the face of the check itself that this money was ever provided to Strike Zone. To the contrary, Debra testified in deposition that this check was used to pay for her personal electric bill. (Doc. No. 175-1 at Tr. 142-143.)

Accordingly, the Court finds that Plaintiffs are not entitled to summary judgment in their favor on their disgorgement claim against Strike Zone for the $1,025 check dated June 26, 2018. Plaintiffs have failed to come forward with any evidence that this particular payment was made and/or transferred to Strike Zone, such that Strike Zone should be ordered to disgorge it. Moreover, while

34

Plaintiffs argue in their Reply Brief that Debra should be held liable for this withdrawal, the record reflects that Plaintiffs' Joint Motion for Partial Summary Judgment did not seek summary judgment against Debra with respect to this $1,025 check.  As has been noted *supra*, this Court will not consider claims and/or arguments raised for the first time in a Reply Brief.  *See Scottsdale Ins. Co*, 513 F.3d at 553; *Lexicon, Inc.*, 436 F.3d at 676.

Accordingly, and for all the reasons set forth above, the Court finds that Plaintiffs are not entitled to summary judgment in their favor with respect to their disgorgement claim against Strike Zone for the $1,025.00 check dated June 26, 2018.

### 7.    Defendant 3D Logistics

Plaintiffs next assert disgorgement claims against Defendant 3D Logistics, LLC (hereinafter "3D Logistics") for twenty-two (22) vehicles that were owned by either P.K. Produce or Magnum and transferred to 3D in January 2019.  (Doc. No. 184 at p. 6.)  These claims are based on vehicle transfer records that are attached as Exhibits to Plaintiffs' Motion. (Doc. No. 184-5.)  Plaintiffs argue that there is no question of material fact that 3D Logistics "received title to vehicles owned by P.K. Produce and Magnum for no consideration, that 3D has defaulted on the claims brought by the PACA claimants to recover those vehicles as PACA trust assets, and therefore the vehicles must be disgorged."  (Doc. No. 184 at p. 3.)

As noted *supra,* 3D Logistics has not made an appearance in this case.  The record reflects that 3D Logistics was first named as a Defendant in this action in the Plaintiff's Amended Complaints, which were filed in March 2020.  *See* Doc. Nos. 97, 104, 105, 106, 108.  Service was returned executed on 3D Logistics by each of the Plaintiffs in March and April 2020.  *See* Doc. Nos. 116, 122, 126, 131, 159.  Between May and September 2020, Plaintiffs filed Applications for Entry of Default

35

against 3D Logistics pursuant to Fed. R. Civ. P. 55(a).  *See* Doc. Nos. 148, 165, 167, 170, 182.  The Clerk of Court entered default against 3D Logistics in response to each of the Plaintiffs' various Applications.[19]  *See* Doc. Nos. 149, 166, 168, 171, 183.

Plaintiffs do not cite any legal authority demonstrating that it would be appropriate for this Court to grant summary judgment pursuant to Fed. R. Civ. P. 56 against named parties who have not answered the Complaint or otherwise made an appearance.  District courts within this Circuit facing similar circumstances have declined to enter summary judgment, finding that entry of default judgment under Fed. R. Civ. P. 55 is the preferred procedure to obtain judgment against a party that has not answered a complaint.  *See, e.g., Derrico v. Moore*, 2019 WL 1876960 at * 8 (N.D. Ohio Apr. 25, 2019) (denying partial summary judgment with respect to claims against defendants who had not answered the complaint or otherwise appeared in the action on the grounds that default judgment is the proper procedure to obtain judgment against such defendants); *Williams v. PBI Bank*, 2017 WL 5629540 at * 2 (W.D. Ky. Nov. 22, 2017) ("This Court similarly finds that Mitch Taylor and Sarah Taylor never answered the third-party complaint and that Rule 55 [rather than summary judgment under Rule 56] is thus the proper procedure for seeking judgment against them."); *United Community Bank v. Blythe Properties*, 2014 WL 852655 at fn 2 (E.D. Tenn. March 5, 2014) ("Although Plaintiff apparently moves for summary judgment against all three defendants in this case, the Court only grants the motion with respect to Jones, the only defendant who has made an appearance in this action. The better course with respect to [defendants] Blythe and Dye is default judgment.")

---

[19] Plaintiffs attach, as an Exhibit to their Joint Motion for Partial Summary Judgment, a pleading captioned "Request for Judicial Notice," in which they request that the Court take judicial notice of the filing of Plaintiffs' various Applications for Entry of Default and the docket entries entering default against these parties.  (Doc. No. 184-16.)  Plaintiffs' request is denied as moot. The Court need not take "judicial notice" of filings and entries on its own docket in the instant action.

Accordingly, the Court denies Plaintiffs' Motion for Partial Summary Judgment with respect to their disgorgement claims against Defendant 3D Logistics.  The proper course is for Plaintiffs to file Motions for Default Judgment against this Defendant.

### 8.   Defendant Argie

Plaintiff R&R Produce, Inc. asserts a disgorgement claim against Defendants George Argie and the law firm of Argie, D'Amico & Vitantonio (hereinafter collectively referred to as "the Argie Defendants") in the total amount of $14, 623.25.  (Doc. No. 184 at p. 6.)  This claim is based on two checks dated July 13, 2018 and October 24, 2018 from P.K. Produce (signed by Debra Kasapis) to the law firm of Argie, D'Amico & Vitantonio, which were produced by the Argie Defendants in discovery herein.  (Doc. No. 184-11.)  In support of this claim, R&R Produce argues that "it has long been held that attorneys who advise PACA debtors are not entitled to retain attorneys' fees paid to them when PACA creditors remain unpaid, as 'any attorneys' fees . . .were impressed with the PACA trust.'" (Doc. No. 184 at pp. 12-13) (quoting *In re Fair*, 134 B.R. 672 (Bankr. M.D. Fl. 1991)).

The Argie Defendants argue that R&R Produce's Motion should be denied with respect to this claim because they constitute *bona fide* purchasers.  (Doc. No. 188 at pp. 18-22.)  The Argie Defendants do not dispute that they received the two checks at issue but assert that they did not have actual or constructive knowledge that acceptance of the checks constituted a breach of the PACA trust.  (*Id.*) Specifically, they argue that "[a]t the time that [George Argie] received the two checks, [he] was not familiar with the business of P.K. Produce, Inc., or that those funds might have been subject to the statutory trust provisions of PACA." (*Id.* at p. 18.)  The Argie Defendants explain that, in fact, Mr. Argie did not become familiar with either the business of P.K. Produce or the nature of the claims being made by Plaintiffs herein until December 14, 2018, following the filing of the within

37

lawsuit.  (*Id.*)  Lastly, the Argie Defendants argue that they took the trust assets "for value" because Mr. Argie provided legal services in exchange for the two checks at issue.  (*Id.*)

In reply, R&R Produce argues that there is no genuine issue of material fact that the Argie Defendants do not constitute *bona fide* purchasers.  (Doc. No. 192 at pp. 10-13.)  With regard to the "for value" prong of the *bona fide* purchaser test, R&R Produce argues that the Argie Defendants fail to sufficiently explain the value that Mr. Argie actually provided in exchange for the checks at issue. (*Id*. at p. 11.)  With regard to the notice prong, R&R Produce maintains that, at the time of the two checks, "Argie and his firm were intimately aware of Debra, Paul, P.K. Produce, Inc., and all the related family businesses that are defendants herein."  (*Id*. at p. 10.)  R&R Produce therefore asserts that it is "simply not accurate" for the Argie Defendants to state that they did not have actual knowledge of the nature of P.K. Produce's business and its finances.  (*Id*.)  Moreover, even if the Argie Defendants did not have actual knowledge, R&R Produce argues that they had constructive knowledge of breach of the trust because "all individuals, particularly attorneys, are on constructive notice of statutes, especially a long-standing federal statute such as PACA."  (*Id*. at p. 12.)

As it is dispositive, the Court need only address the "for value" prong of the *bona fide* purchaser defense.  As noted *supra*, a *bona fide* purchaser is one who takes *trust property* "for value and without notice of breach of trust." *Endico Potatoes, Inc.*, 67 F.3d at 1068 (quoting Restatement (Second) of Trusts § 284 (1959)) (emphasis added).   Specifically, in the PACA context, courts have held that "a transfer is for value '[i]f money is paid or other property is transferred or services are rendered as consideration for the transfer of trust property.'"  *Id*. (quoting Restatement (Second) of Trusts § 298).  *See also Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 413 (5th Cir. 2003) (same); *Chiquita Brands v. Micbruce, Inc.*, 800 F. Supp. 1521, 1525 (N.D.

Ohio 1992) ("As permitted under PACA and as defined by trust law, NW has given value to Freshline in the form of its transport services, and received payment to which it was entitled.")

For the following reasons, the Court finds that the Argie Defendants have not satisfied their burden of demonstrating that they meet the "for value" prong of the *bona fide* purchaser defense. Necessarily implied in the law regarding this prong is that the trust assets at issue are transferred as consideration for value given *to the transferor* -  here, P.K. Produce.   As noted above, the two checks at issue were paid from P.K. Produce's checking account.   However, in their Brief in Opposition, the Argie Defendants state that "when the monies in question were paid to Attorney Argie they were paid as legal fees for work that was performed by Argie and/or by the law firm, for legal work that was *unrelated to P.K. Produce*."  (Doc. No. 188 at p. 22) (emphasis added).  The Argie Defendants do not explain how legal fees paid by P.K. Produce for work that was "unrelated to P.K. Produce" was of any "value" to P.K. Produce, for purposes of the *bona fide* purchaser defense.  Nor do the Argie Defendants direct this Court's attention to any legal authority supporting a finding that the "for value" prong is satisfied under these circumstances.

Accordingly, the Court finds that the Argie Defendants have failed to satisfy their burden of demonstrating that the *bona fide* purchaser defense applies.  Plaintiff R&R Produce is, therefore, entitled to summary judgment in its favor with respect to its disgorgement claims against the Argie Defendants.

### 9.    P.K. Produce

Finally, Plaintiffs assert disgorgement claims against Defendant P.K. Produce in the total amount of $67, 083.23.  (Doc. No. 184 at p. 7.)  Plaintiffs explain that "P.K. Produce's only remaining PACA Trust Asset of value held in its name consists of cash in the amount of $67,083.23, which was

previously transferred to the IOLTA account of one of Plaintiffs' counsel, Martyn and Associates, pursuant to this Court's Order." (*Id.*) *See also* Declaration of Mark Amendola (Doc. No. 184-18) at ¶ 7. Defendant P.K. Produce does not acknowledge or address this claim in its Brief in Opposition. (Doc. No. 188.)

It is undisputed that the $67,083.23 contained in Plaintiffs' counsel's IOLTA account constitutes a PACA Trust asset. It is further undisputed that the PACA Trust has been dissipated and depleted to Plaintiffs' detriment. Accordingly, and in light of the lack of opposition, Plaintiffs' request for summary judgment in their favor with respect to their disgorgement claim against P.K. Produce for $67, 083.23 is granted.

### C. Secondary Liability of Defendant Debra Kasapis

Plaintiffs and Debra each move for summary judgment in their favor with respect to Plaintiffs' claims that Debra is individually liable under PACA. (Doc. No. 184, 189.) In their Motion, Plaintiffs assert that there is no genuine issue of material fact that Debra is individually liable because the undisputed evidence shows that she is the sole owner of P.K Produce and was in a position to control the trust assets. (Doc. No 184 at pp. 13-15.) Plaintiffs assert that Debra breached her fiduciary duty to ensure that the PACA trust assets were available to satisfy P.K. Produce's outstanding payment obligations to Plaintiffs and, therefore, she may be held individually liable as a matter of law. (*Id.* at p. 14.)

Debra opposes Plaintiffs' Motion and asserts that, in fact, there is no genuine issue of material fact that she is entitled to summary judgment in her favor with respect to this claim. (Doc. Nos. 188, 189.) Debra maintains that the mere fact that she was the sole owner of P.K. Produce is insufficient, arguing "it is important to apply context—rather than mere formality—when addressing the question

of personal liability, especially with regard to a 'mom and pop' corporation" like P.K. Produce.  (Doc. No. 188 at p. 27.)  In this regard, she asserts that "the totality of the record reflects that [she] had no experience in the produce industry; that she was placed into this position of 'power' for the sole purpose of replacing her husband Paul as the figurehead, on the eve of him going to prison, and only because the banks would not allow the company to maintain a commercial bank account if Paul stayed at the helm; and that the 'power' was exercised by a combination of Paul from inside prison and his friend Jeff Heestand on the outside."  (*Id*. at p. 23.)  Based on the above, Debra asserts that she cannot be held personally liable as a matter of law and is, therefore, entitled to summary judgment in her favor.  (Doc. No. 189 at p. 19.)

"PACA liability attaches first to the licensed commission merchant, dealer, or broker of perishable agricultural commodities."  *Golman-Hayden Co., Inc. v. Fresh Source Produce Inc.*, 217 F.3d 348, 351 (5th Cir. 2000).  *See also Iscavo Avocados USA, LLC v. Pryor*, 953 F.3d 316, 318 (5th Cir. 2020).  If, however, the assets of the licensed commission merchant, dealer, or broker are insufficient to satisfy the PACA liability, then others may be held secondarily liable under certain circumstances.  *See Arava USA, Inc*., 474 Fed. Appx. at 453; *Iscavo*, 953 F.3d at 318; *Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.,* 623 F.3d 163, 170 (3rd Cir. 2010); *Coosemans Specialties, Inc.*, 485 F.3d at 705-706; *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir. 1997).  Here, it is undisputed that P.K. Produce's assets are insufficient to satisfy its PACA liability.  Thus, the Court may consider whether Debra may be held individually liable for any shortfall.

"Individual liability in the PACA context is not derived from the statutory language, but from common law breach of trust principles."  *Weis–Buy Servs. v. Paglia*, 411 F.3d 415, 421 (3rd Cir. 2005) (citing *Sunkist Growers, Inc.*, 104 F.3d at 282).  Applying these trust principles, the Sixth

41

Circuit has held that "individual shareholders, officers, or directors of a corporation who are in a position to control statutory trust assets, and who fail to preserve those assets, may be held personally liable under the Act." *Arava*, 474 Fed. Appx. at 453 (citing *Sunkist Growers, Inc.*, 104 F.3d at 283). *See also Six L's Packing Co., Inc. v. Beale*, 524 Fed. Appx. 148, 156 (6th Cir. 2013) (noting that "our sister circuits unanimously agree PACA imposes individual liability on corporate officers, shareholders, and others, to the extent that they control the trust assets") (collecting cases).

While the parties agree that this is the general test for individual liability, they disagree about what the test means and how it should be applied to the facts of the instant case.  Plaintiffs assert that they need only show that Debra was the sole owner of P.K. Produce and had the ability and authority to control the trust assets  --  not that she was actually involved in P.K. Produce's day to day business operations.  (Doc. No. 184 at p. 14.)  In support of this argument, Plaintiffs rely heavily on *Iscavo Avocados USA v. Pryor*, 953 F.3d 316 (5th Cir. 2020) and *Ruby Robinson Co. v. Herr,* 453 Fed. Appx. 463 (5th Cir. 2011).  In those cases, the Fifth Circuit explained that "actual involvement is not the standard" for individual liability under PACA.  *Iscavo Avocados*, 953 F.3d at 319.  For example, in *Iscavo Avocados*, the court affirmed a district court decision finding personal liability as follows:

> Pryor was an officer and 80% owner of Coram Deo, he was listed as its principal on its PACA license, and he had access to Coram Deo's assets, including its bank account.  It is undisputed that, in this role, Pryor had the ability to control Coram Deo's assets but failed to do so. The district court did not therefore err in holding Pryor personally liable. *See* [*Golman-Hayden*, 217 F.3d at 351] (holding a shareholder personally liable because "he manifestly had absolute control of the corporation" but "refus[ed] or fail[ed] to exercise any appreciable oversight of the corporation's management").
>
> Pryor nevertheless argues he should not be held liable because his partner handled everything; Pryor "was not involved in the day-to-day financial or business operations of the business." But actual involvement is not the standard. Indeed, Pryor is individually liable precisely *because* he refused to be involved in Coram Deo. Pryor had the authority to ensure Coram Deo's trust assets were preserved for the

42

> beneficiaries of the PACA trust, but he refused to exercise that authority. *See Ruby Robinson Co. v. Herr*, 453 F. App'x 463, 465 (5th Cir. 2011) ("It is established that a shareholder may not avoid liability under PACA merely by failing to assume responsibilities that he is entitled to." (citing *Golman-Hayden*, 217 F.3d at 351)). Summary judgment was therefore proper.

*Id.* (emphasis in original). *See also Ruby Robison*, 453 Fed. Appx. at 465 ("A shareholder 'may not escape liability based on a real or claimed failure to exercise his right and obligation to control the company.'") (quoting *Golman-Hayden*, 217 F.3d at 351).  Applying this test, Plaintiffs herein assert that they are entitled to summary judgment in their favor because there is no genuine issue of material fact that, as sole owner, Debra had access to and the ability to control P.K. Produce's trust assets, including its bank accounts.

Debra, on the other hand, argues that the mere fact that she is the sole owner of P.K. Produce is not sufficient to impose individual liability.  Rather, relying on *Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.,* 623 F.3d 163 (3rd Cir. 2010), Debra argues that this Court should examine the context of her involvement in P.K. Produce and only impose personal liability if she was "actually able" to control PACA trust assets.  In *Bear Mountain Orchards*, plaintiffs asserted PACA claims against Ellis Fleischer Produce Co. and co-owners/operators Ellis Fleischer and Jacqueline Fleischer, who were husband and wife.  The district court granted summary judgment in plaintiffs' favor against Fleischer Produce and Ellis Fleischer but denied summary judgment against Jacqueline Fleischer individually, finding that there was a genuine issue of material fact as to whether Mrs. Fleischer was "actually involved" in operating Fleischer Produce.  The district court then held a bench trial on the issue of Mrs. Fleischer's individual liability, after which it concluded that "although Mrs. Fleischer was an employee of the company for a time, the facts showed that she was not involved in any of the

fundamental business decisions, and [that] there was no evidence that she had any managerial role in the operation of the company." *Id*. at 169.

The Third Circuit affirmed.  After reviewing circuit court authority regarding individual liability under PACA, the court concluded as follows:

> Taken together, these cases suggest a test (whether ascribed as "position of control" or otherwise) that takes into account formal position(s) but relies primarily on context. It calls on courts to: 1) determine whether an individual holds a position that suggests a possible fiduciary duty to preserve the PACA trust assets (e.g., officer, director, and/or controlling shareholder); and 2) assess whether that individual's involvement with the corporation establishes that she was actually able to control the PACA trust assets at issue. [footnote omitted]. The ability to control is core. A formal title alone is insufficient—especially when faced with a small, "mom and pop" corporation such as Fleisher Produce, where formalities may be less meaningful.

*Id*. at 172.  The court then applied this test to Mrs. Fleischer and concluded that "regardless of any formal title(s) or stock holdings, she did not have the ability to control PACA trust assets during the relevant time period." *Id*. at 173.  In support of this conclusion, the court noted as follows:

> Importantly, Mrs. Fleisher testified that she was not involved in any of Fleisher Produce's major business decisions and was never involved in the day-to-day management of the corporation. This assessment was confirmed by Mr. Fleisher's office manager (Matsinger) and by Mr. Fleisher himself, all in testimony that the District Court found credible. For instance, Matsinger testified that she supervised Mrs. Fleisher's work. Mrs. Fleisher worked only two to three days per week from 9:00 A.M. to 2:00 P.M. for a weekly salary of $200. In that role, she performed "basic clerk level"—operational, as opposed to managerial—tasks, such as collecting tickets, writing checks (at the direction of Matsinger or her husband), and preparing payrolls. Mrs. Fleisher never supervised any Fleisher Produce employee.
>
> Mr. Fleisher confirmed his wife's restricted and controlled operational role within the corporation. From May 2006 through March 2007, when Fleisher Produce paid out over $8 million, Mr. Fleisher testified that he never consulted with his wife about these payments. In fact, he explained that, in the three decades that he ran Fleisher Produce, he never involved his wife in any business decisions. Instead, she remained his subordinate, taking directions from him (or Matsinger) on a daily basis. [fn omitted] In this role, Mrs. Fleisher never made suggestions to her husband about how to organize or manage the business. Operationally, Mr. Fleisher and Matsinger instructed Mrs. Fleisher on which checks to write or loan documents to sign. When Mr. Fleisher

was traveling, Matsinger either made important business decisions on her own or received instructions from Mr. Fleisher. Neither relied on Mrs. Fleisher's judgment. When Fleisher Produce was forced to close, Mr. Fleisher did not consult with his wife before closing the business; he simply told her after the fact.

Mrs. Fleisher corroborated her husband's testimony as well as that of Matsinger. She confirmed that she never wrote checks on her own, but only when instructed to do so by her husband or Matsinger. She also did not review any corporate documents that her husband told her to sign; she simply signed them. In addition, she explained that there were no employees who were responsible to her, that she never examined the corporation's tax returns, and that she never directed another employee to pay a vendor. And, not to gild the lily, she worked only part-time. Collectively, this testimony supports the finding that she had no actual ability to manage the corporation, and hence no power to control its use of PACA trust assets.

*Id*. at 173-174.  Because Mrs. Fleischer was a "mere subordinate," the court found that she could not

be held personally liable under PACA.  *Id*. at 174.

Based on *Bear Mountain Orchards*, Debra argues that she is entitled to summary judgment in

her favor or, "at the very least, [that] there are genuine issues of material fact regarding the context

of her involvement with P.K. Produce."  (Doc. No. 188 at p. 27.)  In support, Debra submits an

Affidavit in which she avers (among other things) that: (1) she never had any involvement with P.K.

Produce before assuming sole ownership in June 2018 when Paul went to prison; (2) although she

was sole owner, Paul put Heestand "in charge of daily operations;" (3) Heestand ran the day to day

business of P.K. Produce and was a signatory on P.K. Produce's bank account; (4) "every monetary

transaction that she participated in . . . and every substantive business decision was at the direction of

either Paul Kasapis, Jeff Heestand, Brett Patalita, or Danny Patalita;" (5) she never placed any

produce orders and rarely went to the produce terminal; (6) she was never on the PACA license; and

(7) she did not derive any income from P.K. Produce during the period June 2018 through October

2018.  (Doc. No. 188-2.)  Thus, Debra maintains, she was not "actually able" to control PACA trust

assets and cannot be held personally liable.

45

Although the Sixth Circuit has held generally that individual shareholders, officers, or directors "who are in a position to control" trust assets may be held personally liable under the PACA, it has not clarified whether it would adopt the approach taken by the Fifth Circuit in *Iscavo Avocados* or by the Third Circuit in *Bear Mountain Orchards*.[20] This Court need not decide this issue, however, because, under either approach, Plaintiffs are entitled to summary judgment in their favor.

First, applying the approach set forth in *Iscavo Avocados*, the Court finds that there is no genuine issue of material fact that Debra is individually liable. As discussed above, in that case, the Fifth Circuit found that "actual involvement is not the standard" for individual liability under PACA. *Iscavo Avocados*, 953 F.3d at 319. Thus, Plaintiffs need only show that Debra was a shareholder, officer, or director of P.K. Produce and that she had the ability to control P.K. Produce's trust assets. Plaintiffs have clearly met their burden. It is undisputed that, at all relevant times, Debra was the sole owner of P.K. Produce and had signatory authority on P.K. Produce's checking account. (Doc. No. 188-2 at ¶ 2.) Thus, the Court finds that Plaintiffs have demonstrated that Debra had the ability to control P.K. Produce's assets. In addition, and in light of P.K. Produce's abrupt closing and the

---

[20] The Sixth Circuit first recognized personal liability under PACA in *Arava USA Inc. v. Karni Family Farm*, 474 Fed. Appx. 452 (6th Cir. 2012), finding that "individual shareholders, officers, or directors of a corporation who are in a position to control trust assets, and who fail to preserve those assets, may be held personally liable under the Act." *Id.* at 453. Since then, the Sixth Circuit has had only one occasion to apply this test in the PACA context. In *Six L's Packing Co., Inc v. Beale*, 524 Fed. Appx. 148 (6th Cir. 2013), the district court found that JE Beale, a salesman, was individually liable under PACA because he had "some leeway in making purchasing decisions on behalf of Sunfresh." *Id.* at 156. The Sixth Circuit disagreed. The court explained that "nothing in *Arava* or previous circuit court decisions suggests that we should extend PACA-liability to individuals who are not shareholders, officers, or directors of a corporation." *Id.* The court then reversed the finding of personal liability as to JE Beale, stating that "unlike the individual defendant in *Arava*, who was the president of the PACA merchant, JE Beale is neither an officer nor a director of Sunfresh. He owns no Sunfresh stock, has never occupied a position comparable to that of a corporate officer or director, and reviews none of Sunfresh's financial reports. In fact, much like the officer absolved of liability in *Bear Mountain Orchards, Inc. v. Mich–Kim, Inc*., 623 F.3d 163 (3d Cir.2010), JE Beale lacked check-signing authority and financial control over Sunfresh." *Id*. Thus, the Sixth Circuit did not examine whether, in the case of an owner or shareholder, it would require "actual involvement" in the corporation's day to day operations before imposing personal liability.

significant disparity between its assets and liabilities, Plaintiffs have also demonstrated that Debra failed to preserve trust assets as required under the PACA.[21]

Moreover, applying Fifth Circuit precedent, the Court rejects Debra's argument that she should not be held liable because management of the company was delegated to Heestand and Brett Patalita. To the contrary, Debra "may not escape liability based on a real or claimed failure to exercise [her] right and obligation to control the company." *Golman-Hayden*, 217 F.3d at 351. *See also Ruby Robinson Co., Inc.*, 453 Fed. Appx. at 465. As the Fifth Circuit noted in *Iscavo Avocados USA, LLC*, *supra*, an owner or officer can be held individually liable "precisely *because* [s]he refused to be involved in" management of a produce company. *Iscavo Avocados USA, LLC*, 953 F.3d at 319 (emphasis in original). Here, Debra had the authority[22] to ensure P.K. Produce's trust assets were preserved for the beneficiaries of the PACA trust, but she refused to exercise that authority. Applying the Fifth Circuit approach, the Court finds that the Plaintiffs are entitled to summary judgment in their favor with respect to their individual liability claims against Debra.

---

[21] Debra argues that she cannot be held individually liable because "there is not even one material fact in support of the conclusion that [she] breached any fiduciary/trust duty to any of the Plaintiffs." (Doc. No. 189 at p. 17.) Specifically, Debra claims that she "never saw the financial records," "had no control over the proceeds from the sale of produce," and was not aware of what the company owed. (*Id.*) This argument is entirely without merit. Although Debra complains about her lack of knowledge regarding the company's finances, she was the sole owner of P.K. Produce and, as such, had the ability and authority to fire Brett Patalita and/or Heestand if she felt they were failing to disclose important financial information or were otherwise evasive. She failed to do so. More importantly, and as discussed *supra*, the record reflects that Debra transferred over $112,000 in cash from P.K. Produce to herself between June and December 2018, thereby failing to maintain trust assets in such a manner that they were freely available to satisfy outstanding obligations to Plaintiffs herein. In addition, Debra abruptly closed P.K. Produce without making any attempt to satisfy accounts payables to PACA claimants or make arrangements for accounts receivables, all to the detriment of Plaintiffs herein. Accordingly, Debra's argument that there is a genuine issue of material fact as to whether she breached a fiduciary duty to Plaintiffs is without merit and rejected.

[22] During her deposition, Debra complained that Brett refused to provide information regarding P.K. produce's finances. (Doc. No. 175-1 at Tr. 42, 174-176.) Debra does not dispute, however, that she had the authority and ability to terminate Brett's employment. Indeed, Debra testified that she "changed [Brett's] pay scale and had actually warned him several times if he didn't do his job, he would be fired." (*Id.* at Tr. 42.)

Second, even if the Court were to apply the test set forth in *Bear Mountain Orchards, supra*, it would nonetheless find that there is no genuine issue of material fact that Plaintiffs are entitled to judgment in their favor.  As noted above, in that case, the Third Circuit found that "formal title alone is insufficient" to impose individual liability and that "the ability to control is core."  *Bear Mountain Orchards,* 623 F.3d at 172.  The facts presented in the instant case, however, are distinguishable from *Bear Mountain Orchards* in several important respects.

In *Bear Mountain Orchards,* the Third Circuit found that Mrs. Fleischer was not personally liable based, in part, on the fact that she never supervised any Fleischer Produce employees, never made suggestions about how to organize or manage the business, and had no role or involvement in the decision to close the business.  *Id.* at 173-174.  Here, by contrast, Debra testified that she had the ability to "adjust" Brett Patalita's pay scale and threatened to terminate his employment, both of which clearly suggest that she played a supervisory role at P.K. Produce during the relevant time period.[23]  (Doc. No. 175-1 at Tr. 42, 174-176.)  She also testified regarding her repeated efforts to obtain financial information and invoices from both Heestand and Brett Patalita, which is inconsistent with her argument that she had no role or involvement in the day to day operations of the business.  (*Id*. at Tr. 42, 53, 174-177.)  Finally, Debra testified that it was she, alone, that made the decision to close P.K. Produce in October 2018.[24]  (*Id*. at Tr. 43.)  She further testified that, after the closure, she instructed Heestand to bring P.K. Produce's equipment and files to the vacant lot next door to her

---

[23]  Text messages sent by Debra to Brett confirm that she functioned as his supervisor. For example, in July 2018, she sent the following text message to Brett: "On Wednesday, I asked you for the administrative passcode for the computer server. It's now Friday and I still don't have it. If you'd like to keep your job at PK Produce, I suggest you stop the bullshit. I need the passcode as administrator. You are free to make yourself a user passcode. If you have an issue with this, feel free to resign, but get it done. Am I understood?" (Doc. No. 175-1 at Tr. 174.)

[24]  When asked whether Paul agreed with her decision to close P.K. Produce, Debra testified "I honestly don't remember if he agreed or not, but I did it anyway." (Doc. No. 175-1 at Tr. 43.)

48

home.  (*Id*. at Tr. 51.)  Obviously, the decision to close P.K. Produce and the determination of what to do with its remaining assets were significant business decisions.  Thus, the undisputed facts demonstrate that Debra had far more involvement and responsibility in company operations than did Mrs. Fleischer.

Moreover, and notably, unlike Mrs. Fleischer who shared ownership of Fleischer Produce with her husband, it is undisputed that Debra is the sole owner of P.K. Produce.  Numerous courts have held that sole owners and shareholders of a corporation are secondarily liable for breach of a PACA trust.  *See, e.g., Morris Okun, Inc*., 814 F. Supp. at 349-350 (finding that sole shareholder who was in a position to control trust assets but failed to preserve them for beneficiaries breached a fiduciary duty and was held secondarily liable for unpaid produce); *Bronia, Inc. v. Ho,* 873 F. Supp 854 (S.D.N.Y. 1995) (sole shareholder, director, and president of corporation held personally liable for corporation's breach of PACA trust).

Accordingly, under either the approach taken by the Third Circuit or the Fifth Circuit, the Court finds that Plaintiffs are entitled to summary judgment in their favor with respect to their individual liability claims against Debra. [25]  Debra's Cross Motion for Summary Judgment is denied.

---

[25] The Court notes that Debra assumed sole ownership of P.K. Produce on June 19, 2018.  (Doc. No. 184-16 at PageID# 3429.) Two of the plaintiffs in the instant action assert claims based on sales occurring prior to that date.  *See* Plaintiff B&D Produce Sales LLC's Amended Complaint (Doc. No. 108 at ¶ 8) (asserting claims based on sales occurring between January 2018 and October 2018); Midwest Best's Amended Complaint (Doc. No. 104 at ¶ 16) (asserting claims based on sales occurring between June 12, 2018 through June 22, 2018).  Debra does not argue that she is not personally liable for sales occurring prior to the date on which she assumed sole ownership.  Therefore, the Court does not address this issue herein.

**V.**     **Conclusion**

For all the reasons set forth above, Plaintiffs' Joint Motion for Partial Summary Judgment (Doc. No. 184) is GRANTED IN PART and DENIED IN PART as set forth herein.  Defendant Debra Kasapis' Cross-Motion for Summary Judgment (Doc. No. 189) is DENIED.

**IT IS SO ORDERED.**


_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  June 2, 2021                               U. S. DISTRICT JUDGE

50